UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JAN 0 7 2020

United States of America,

—v—

Tyrone Woolaston,

           Defendant.

18-cr-212 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

On February 21, 2019, following a seven-day jury trial that began on February 11, 2019, Defendant Tyrone Woolaston was convicted on two counts of a Superseding Indictment, Dkt. No. 75.[1] *See* Trial Tr. at 1370-73. The Defendant now moves, pursuant to Federal Rules of Criminal Procedure 29 and 33, for acquittal or, in the alternative, a new trial. For the following reasons, the Defendant's motions are denied.

I.  **BACKGROUND**

For purposes of these motions, the evidence is viewed in the light most favorable to the Government and all reasonable inferences are drawn in its favor. *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002).

A.  **The Charges**

The indictment charged Woolaston with (1) conspiring to distribute and possess with intent to distribute five kilograms or more of mixtures and substances containing a detectable amount of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) ("Count One"); and (2) use of a firearm in furtherance of that narcotics conspiracy in violation of 18 U.S.C.

---

[1] The late Honorable Robert W. Sweet presided over trial in this case, which was subsequently transferred to the undersigned.

§ 924(c)(1)(A)(i) ("Count Two"). The Government alleged that these crimes arose out of Woolaston's participation in a narcotics conspiracy operating in and around Newark Liberty International Airport (the "Airport") to organize the smuggling of luggage containing cocaine shipments from Caribbean islands.

## B. The Trial

At trial, it was largely undisputed that Woolaston had committed the charged crimes, and the questions before the jury were whether venue was proper and whether Woolaston was entrapped by the Government.

### 1. The Government's Case

At trial, the Government presented evidence in the form of witness testimony, phone records, recordings of wiretap interceptions, text message records, consensual recordings made by the cooperating witness, and law enforcement testimony relating to the Defendant's actions directly preceding his arrest. This evidence proved the following conspiracy.

#### a. The Homeland Security Investigation

The charged conduct arose out of a sting operation. In 2015, a confidential informant reached out to the Department of Homeland Security's Homeland Security Investigations division with information about what he believed to be a narcotics trafficking network operating out of Newark Airport. Tr. 199. Agents in the division worked with the informant to approach Xavier Williams, who they believed was involved in the network, as a target. They proposed a sting operation in which Williams would use his contacts at the Airport to smuggle cocaine through the airport, but Williams eventually backed out and the proposed transaction never occurred.

In 2017, however, the contours of a new operation began to take shape. In October 2017, Williams met with a confidential informant and discussed a new transaction: five kilograms of cocaine would be smuggled into the United States by being placed in luggage on an international commercial flight that would arrive at the Airport, after which a contact Williams had at the airport could arrange to have the checked suitcase pulled off the international flight and placed in the baggage claim for a domestic flight. Tr. 476-80; GX 401T. During this meeting, Williams communicated with Woolaston by text message, and ultimately took the confidential informant to the firehouse at which Woolaston worked a second job as a firefighter. Tr. 484-86; GX 204. There, Woolaston got into the car with Williams and the confidential informant, who discussed the details of the plan: that the cocaine would be shipped from the Caribbean through the airport, the price per kilogram charged for the cocaine, the number of kilograms to be smuggled, and available flights and dates on which the smuggling could occur. GX 403T; Tr. 493-99. The confidential informant asked Woolaston questions about the plan to which Woolaston responded. *Id.*; Tr. 493-99. Woolaston made various remarks in response, including "it is good, if you're saying it is what it is," stating that he would need to "talk[] to my team," noting that he would need to see if "customs is really watching" the flight, and remarking that a prior flight had gotten "bit." GX 403T.

In January 2018, the confidential informant again met with Williams. GX 411, 412. He brought $10,000 in cash as a deposit for the anticipated deal. Tr. 546. Williams placed a FaceTime call to Woolaston in order to show Woolaston this money. Tr. 546-51. Also during the phone call, the confidential informant stated that he would be "in the city" later that day. GX 411T. Later that night, Woolaston came to Williams's house, where Williams gave Woolaston some of the cash to put in a safe he stored at Williams's house. Tr. 554-56. Williams told

3

Woolaston that the confidential informant "was in the city, and he would try to call us later." Tr. 556. The confidential informant then called Williams later that evening from his Manhattan hotel to discuss what Williams described as "drug trafficking." *Id.* The next day, Williams informed the confidential informant that he had spoken with Woolaston, who had asked if they could move up the date of the planned flight. GX 810. Further, over the course of the evening, Williams sent the confidential informant several text messages updating the confidential informant on when Woolaston would be coming over. *Id.*

### C.     The Operation and Arrests

Following the January 6 meeting, the confidential informant engaged in further telephone and text communications with Williams. In these communications, they agreed that the confidential informant would have five kilograms of cocaine transported to the Airport on an international flight arriving February 10, 2018 and that Williams and Woolaston would smuggle the cocaine through the airport to deliver it to the confidential informant. Tr. 563-64. Unbeknownst to Williams or Woolaston, the Homeland Security Investigations agents planned to package sham cocaine into the anticipated suitcase on the agreed-upon flight and to take delivery of the cocaine from Williams and Woolaston in an undercover operation.

On February 10, 2018, this is what they did. They placed the sham cocaine, concealed in rum cake tins, into the expected suitcase on an international flight that arrived at the airport that evening. Tr. 207, 215. After the flight unloaded, the suitcase did not arrive at the baggage carousel. Tr. 217. Instead, on a phone call with Williams, Woolaston stated that he had the bag and the pair discussed the narcotics and their packaging. Woolaston stated he was concerned about how the drug transaction would proceed and both defendants indicated that they would have guns. Tr. 576; GX 405T.

On February 11, 2018, the confidential informant and Williams agreed to meet at a hotel in Secaucus, New Jersey to exchange the drugs for the cash. In anticipation of this meeting, Williams and Woolaston debated whether Williams should hold some of the drugs back as collateral. Tr. 594-602; 409T. Williams ultimately agreed to deliver only a portion of the sham narcotics. Tr. 603-04. Woolaston also assured Williams that he would "come in there blazing" if Williams had an issue during the exchange with the confidential informant. GX 413T; Tr. 594-602.

Williams and Woolaston arrived at the hotel separately. Tr. 46-48. Law enforcement apprehended Williams carrying a duffel bag containing several kilos of the sham cocaine. They then attempted to apprehend Woolaston: after they approached him in the hotel parking lot, Woolaston dropped his bag and fled, losing his firearm in the ensuing chase. Tr. 48-53, 221. Woolaston surrendered to law enforcement the following day. Tr. 221. Law enforcement recovered the bag Woolaston dropped, which contained tins of sham cocaine, and the firearm, a .40 caliber Glock pistol loaded with an extra-capacity magazine and outfitted with a laser sight. Tr. 50-56, 65.

Following his arrest, Williams cooperated with law enforcement, including consenting to a search of his residence. Tr. 66. This search revealed a police scanner, money counter, the rum cake tins agents had placed inside the suitcase to conceal the sham cocaine, and a safe Woolaston kept in Williams's basement. The safe contained a pistol, two laser-sights, four pistol magazines, more than one hundred rounds of ammunition, and an ammunition speed-loading device. Tr. 76-84.

**D.      Defense Case**

The defense raised the affirmative defense of entrapment. The defense case consisted of consensually recorded telephone calls between the confidential informant and Williams; business records and supporting testimony reflecting the Defendant's attendance record; testimony from the confidential informant and contemporaneous email and text records; and testimony from the Homeland Security Investigations case agents. In its case, the defense argued that Woolaston was absent from work during the purported 2015 transaction. Tr. 887-93. It also elicited testimony that the agents had booked and arranged the Manhattan hotel, and from there instructed the CI to call Williams multiple times. Tr. 993-94

It further elicited testimony that the confidential informant for the most part worked directly only with Williams. Tr. 901. And the defense elicited testimony it argues goes to Woolaston's resistance to the transaction, including the fact that at some points in 2016 and 2017, Williams may not have been responsive to the confidential informant's overtures, Tr. 910-12, 967, prompting an agent to instruct the confidential informant to "sell" the plan to Woolaston and Williams, Tr. 976; as well as that the confidential informant may have wanted to give deposit money to Woolaston to "lock" him in to the plan. Tr. 962.

Finally, the defense elicited testimony that it argues went to Williams's credibility, including law enforcement testimony it contends confirmed inconsistent statements Williams made regarding the scope of his prior interactions with Woolaston and his ability to remember his post-arrest interview. Tr. 626-28; Tr. 1050-52.

### E.     The Charge

Judge Sweet instructed the jury on Woolaston's affirmative defense of entrapment and included the instruction that as a matter of law the defense had established the first element,

inducement. Tr. 1324-27. Judge Sweet declined, however, to instruct the jury on manufactured venue.

### F. The Deliberations and Verdict

During deliberations the jury sent notes asking whether the Defendant had to have actual knowledge that an act in furtherance of the conspiracy occurred in the Southern District for venue to be proper. They also asked for Government exhibits relating to the January 2018 communications between the confidential informant and Williams. Tr. 1357; 1369. Following deliberations, the jury returned a verdict finding Woolaston guilty on both counts of the Superseding Indictment.

### G. Post-Trial

Following trial, the Defendant filed the instant motions for acquittal and new trial, pursuant to Rules 29 and 33. The motions were fully briefed as of May 22, 2019, and this Court held oral argument on June 26, 2019.

## II. LEGAL STANDARD

Under Federal Rule of Criminal Procedure 29, a district court "will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citing Fed. R. Crim. P. 29(a), (c)). The Second Circuit has stated that "[a] defendant who challenges the sufficiency of the evidence to support his conviction 'bears a heavy burden,'" *Id.* (quoting *United States v. Finley,* 245 F.3d 199, 202 (2d Cir.2001)), although "not an impossible one." *United States v. Kapelioujnyj*, 547 F.3d 149, 153 (2d Cir. 2008) (citing *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004)). "Not only must the evidence be viewed in the light most favorable to the Government and all permissible

inferences drawn in the Government's favor, but the jury verdict must be upheld if '*any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

*Jackson*, 335 F.3d at 180 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).  The evidence

"must be viewed in light of the totality of the Government's case, since one fact may gain color

from others." *United States v. Tramunti*, 500 F.2d 1334, 1338 (2d Cir. 1974).

     Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and

grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  "The district court

must strike a balance between weighing the evidence and credibility of witnesses and not

'wholly usurping' the role of the jury." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir.

2001) (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)).  While "the trial court

has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal

under Rule 29, . . . it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most

extraordinary circumstances.'" *Id.* at 134 (quoting *United States v. Sanchez*, 969 F.2d 1409,

1414 (2d Cir. 1992)).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict

stand would be a manifest injustice." *Id.*  That is, "[t]here must be a real concern that an

innocent person may have been convicted." *Id.* (quotation omitted).

## III.   DISCUSSION

     The Defendant's motion raises five separate grounds for relief: (1) that there was

insufficient evidence for a jury to conclude that the Government established venue in the

Southern District of New York; (2) that there was insufficient evidence that Woolaston was

predisposed to engage in the narcotics transaction; (3) that Court improperly refused to instruct

the jury on a manufactured venue defense and precluded Woolaston from presenting such a

defense;  (4) that the Court failed to properly instruct the jury on predisposition; and (5) that a

new trial is warranted because of improperly admitted firearms evidence and the exclusion of Williams's post-arrest statement.

## A. Sufficiency of the Evidence

### 1. A Rational Jury Could Have Concluded that the Government Established Venue in the Southern District of New York by a Preponderance of the Evidence

First, the Defendant argues that no reasonable jury could find that venue was proper in the Southern District of New York. Viewing the evidence in the light most favorable to the Government and drawing all permissible inferences in its favor as it must on this Rule 29 motion, the Court disagrees.

Venue for a conspiracy charge lies in any district in which an overt act in furtherance of the conspiracy took place provided that the act was performed by a co-conspirator and was undertaken for the purpose of accomplishing the objectives of the conspiracy. *United States v. Kirk Tang Yuk*, 885 F.3d 57, 68-69 (2d Cir. 2018). In the Second Circuit, there is the further requirement that it was "reasonably foreseeable" to the defendant that a qualifying overt act would take place in the District. *Id.* at 69-70 (quotation omitted). "Because venue is not an element of a crime, the government must prove its propriety only be a preponderance of the evidence." *Id.* at 71.

At trial, the Government introduced evidence from which a rational jury could conclude that these elements were met by two different overt acts undertaken by the Defendant and his co-conspirators: a 2013 trip to Queens and a 2018 communication between the confidential informant and Williams.

The evidence of the 2013 trip to Queens was as follows. First, Williams testified that roughly six years before the date of the trial, he and the Defendant drove to Queens from New Jersey. Tr. 442. He further testified that the Defendant told him that the purpose of the trip was

9

to meet a "Jamaican guy" in order to "work[] on another drug shipment." Tr. 442:1, 444:3. Williams testified that only the Defendant actually went out of the car to speak with the Jamaican man, but he did say that the drug shipment discussed by the Defendant was later seized by customs. Tr. 443:21-22, 444:9. The Government also elicited testimony from an investigative analyst that it is practically impossible to travel to Queens without passing through Manhattan, the Bronx, or the Verrazzano-Narrows Bridge, all of which are within the Southern District of New York. *See* Tr. 847-51. From this evidence, the jury could have concluded by a preponderance of the evidence that the Defendant traveled through the Southern District in furtherance of the charged narcotics conspiracy.

The Defendant makes a number of counterarguments about the evidence of the 2013 trip, none availing. First, the Defendant argues that Williams's less than vivid recollection of the 2013 trip and self-interested motivation in testifying made it unreasonable for the jury to credit his testimony. But at this stage, "the evidence [must] be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor." *Jackson*, 335 F.3d at 180. Courts accord a "high degree of deference . . . to the jury's evaluation of witness credibility." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012); *see also United States v. Landau*, 155 F.3d 93, 104-5 (2d Cir. 1998). Such determinations should only be disturbed in "an egregious case." *Raedle*, 670 F.3d at 418. That Williams was a cooperator and had only a sparse memory of an event that occurred six years ago did not require the jury to discredit his testimony.

Second, the Defendant contends that Williams's testimony did not sufficiently connect the drug trafficking plot with the "Jamaican guy" to the charged conspiracy. However, Williams testified that the Defendant had previously worked with the "Jamaican guy" to traffic drugs

through the airport as part of "the defendant's cocaine smuggling operation," and that the purpose of this particular trip was to discuss "another drug shipment." Tr. 439:20, 442:1, 444:3. From this testimony, the jury could have reasonably found that it was more likely than not that the 2013 trip was part of the charged conspiracy.

Additionally, the Defendant points to two jury notes as establishing that the jury discredited Williams's testimony on the 2013 trip and relied only on the 2018 communications (discussed below) to find venue. The jury notes asked whether the Defendant had to have actual knowledge that an act in furtherance of the conspiracy occurred in the Southern District and requested to see transcripts, WhatsApp messages, and call records relating to the 2018 communications. Tr. 1357, 1369. The Defendant argues that it would have been unnecessary for the jury to make these requests if it was relying on the 2013 trip to find venue. But to the contrary, the fact that the jury focused on the 2018 communications in its deliberation notes does not establish anything more than that the jury had questions about those communications. Jurors are not necessarily judicial minimalists seeking to rely on as few factual grounds as possible for their verdict. They may have relied upon both the 2013 trip and the 2018 communications. Alternatively, their deliberations might have focused first on the 2018 communications before turning to the 2013 trip. It is impossible to draw any clear inferences from the jury's inquiries.

Defendant cites cases where courts relied on jury notes, but they are distinguishable. *United States v. Rivas* involved a failure by the Government to disclose exculpatory evidence under the *Brady* doctrine. 377 F.3d 195 (2d Cir. 2004). The jury asked a question during deliberations about a part of the case for which the *Brady* material would have been exculpatory. The court reasoned that the question "suggests that the jurors may have been concerned" about that part of the case. *Id.* at 200. It relied in part on the jury's question to hold that there was a

reasonable likelihood that the *Brady* violations affected the outcome of the case. *Id.* In contrast, to *Rivas*, the Defendant asks the Court not to infer from the jury's question that they "may have" relied on the 2018 communications to find venue or that there was a "reasonable likelihood" that they relied on the 2018 communications. Defendant asks the Court to find that they did in fact rely solely upon those communications, an inference that is significantly more attenuated than the one made by the *Rivas* court. Defendant also cites to *Graham v. Harris* in support of its argument. 452 F. Supp. 137 (S.D.N.Y 1978). In that case, the court relied upon jury requests to have certain testimony read back to them as evidence that the length of the jury deliberations was due to debate among the jurors, and was not the product of judicial coercion. *Id.* at 140. The inference sought by the Defendant in this case is again considerably more speculative than merely finding that the jury had discussions as to whether the 2018 communications established venue. Likewise, in *United States v. Le*, the court inferred from the jury question, "[a]re we allowed to consider the statements made to police as evidence, or *only* to impeach statements made in court?" that jury did in fact understand that statements to police could be used as impeachment evidence. 512 F.3d 128, 133 (5th Cir. 2007). This is a much more modest inference than the one made by the Defendant in this case.

Furthermore, the courts in *Rivas* and *Graham* reasoned that the juries focused their inquiries on the parts of those cases about which they had doubts or concerns. *See* 377 F.3d at 200; 452 F. Supp. at 140. If one were to apply this premise to the jury questions in this case, it would suggest that the jury had doubt about the 2018 communications, which arguably makes it more likely that they in fact relied upon the 2013 trip to find venue. In short, it would simply be too speculative to infer the jury's reasoning from its notes to Judge Sweet.

Independently, the Government's evidence established that the 2018 communications were an act in furtherance of the conspiracy that occurred in Manhattan and were reasonably foreseeable to the Defendant. As to an act in furtherance, the Government established that the confidential informant called Williams from a Manhattan hotel on the evening of January 6, 2018 and that the subject of this phone call was drug trafficking. GX 301R; Tr. 550-56. The Government further established that the confidential informant exchanged text messages with Williams while the former was in Manhattan. GX 810. "A telephone call placed by someone within the Southern District of New York—even a person acting at the government's direction—to a co-conspirator outside the Southern District can render venue proper as to the out-of-district co-conspirator so long as that co-conspirator 'uses the call to further the conspiracy.'" *Tang Yuk*, 885 F.3d at 71 (quoting *United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007)); *see also United States v. Gomez*, 751 F. App'x 63, 69 (2d Cir. 2018) (noting that a single telephone call used to further a criminal scheme may be sufficient to establish venue).

The fact that the confidential informant would communicate with Williams while he was in the Southern District was reasonably foreseeable to the Defendant. Williams testified to telling the Defendant that the confidential informant would be in "the city," and that the confidential informant "would try to call us later." Tr. 556; GX 411T.

The Defendant's argument to the contrary is that Williams's testimony about the communication was insufficiently specific to support the finding that the 2018 communications were an act in furtherance of the conspiracy foreseeable to the Defendant. But at this stage, the Court must "defer[] to the jury's assessments of the witnesses' credibility." *United States v. Johnson*, 939 F.3d 82, 88 (2d Cir. 2019) (quotation omitted). The jury was entitled to find that Williams testified accurately as to both the subject matter of the 2018 communications, as well

as what he told the Defendant about the informant's location. They were further entitled to infer that the informant and Williams were likely communicating about the charged conspiracy from the fact that they had many communications of this nature and the call happened shortly after the exchange of funds. *See* Tr. 449, 556. Similarly, the jury could reasonably infer that overt acts in furtherance of the conspiracy, including further plans about how to proceed, were reasonably foreseeable to the Defendant. Williams testified that he told the Defendant that the confidential informant "was in the city, and [that] he would try to call us later." Tr. 556. The past pattern of communications between the confidential informant and recent exchange of funds entitled the jury to find that it would be reasonably foreseeable that the "call" from the confidential informant would be in furtherance of the narcotics conspiracy.

Finally, the Defendant argues that Williams's reference to "the city" was too vague to make it reasonably foreseeable to the Defendant that the confidential informant would be in the Southern District of New York. The Court disagrees. In *Tang Yuk*, a co-conspirator told a defendant, who was in Florida at the time, that he was "up in New York," before "discuss[ing] several issues related to their drug trafficking conspiracy." 885 F.3d at 73-74. The Second Circuit held that the jury was entitled to find that the reference to "New York" made it reasonably foreseeable to that defendant that an act in furtherance of the conspiracy would occur in Southern District of New York, as opposed to another part of the state. *Id.* at 73 n.4. "The city," when spoken to someone in the New York metropolitan area, is no less of a specific reference to the Southern District of New York than "New York" was when spoken to someone in Florida. Based on *Tang Yuk*, the jury was entitled to find that venue was reasonably foreseeable. The Defendant's sufficiency of the evidence challenge on venue is denied.

  **2.  A Rational Jury Could Find the Defendant Was Predisposed to Engage in the Narcotics Transaction Beyond a Reasonable Doubt**

14

Next, the Defendant argues that there was insufficient evidence to prove he was predisposed to engage in the narcotics transaction. The Court disagrees.

The affirmative defense of entrapment requires a defendant to make a *prima facie* showing of inducement by the Government, after which the burden shifts to the Government to prove beyond a reasonable doubt that the Defendant was predisposed to commit the crime. *United States v. Bala*, 236 F.3d 87, 94 (2d Cir. 2000). Here, Judge Sweet found that inducement had been proven as a matter of law, and the only question was predisposition. The purpose of the predisposition element is to determine "whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *United States v. Cromitie*, 727 F.3d 194, 204 (2d Cir. 2013) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)). The government carries its burden if it proves that "the defendant is of a frame of mind such that once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion." *Id.* at 215 (quoting *United States v. Williams*, 705 F.2d 603, 618 (2d Cir. 1983)). Predisposition may be shown by evidence of existing criminal conduct similar to the crime charged; an already formed design to commit the crime; or evidence that the defendant is ready and willing to commit the crime. *United States v. Brunshtein*, 344 F.3d 91, 101-2 (2d Cir. 2003).

The Defendant's arguments focus primarily on the Government's attempts to connect the Defendant to the 2013 transaction and failed 2015 airport drug trafficking incidents involving Williams. However, there is a strong record of the Defendant's predisposition, independent of these two incidents.

First, the recording of the October 27, 2017 meeting contains ample evidence from a which a jury could conclude that the Defendant had deep experience in trafficking drugs through Newark Airport and was ready, willing, and able to do so again. For example, the Defendant mentions a previous incident in which a flight was "bit" by law enforcement. GX 403T at 5, 53. He states that he cannot commit to a drug deal without "talking to my team first." *Id.* at 45. A jury could reasonably find that this is a reference to other people with whom the Defendant regularly works to traffic drugs.

The Defendant's language could also reasonably be interpreted as suggesting an ease and familiarity with drug trafficking. Early on in the conversation, the Defendant uses drug trafficking slang to refer to the amount of cocaine, asking "so what digit we're talking 'bout sending?" *Id.* at 10. He then cautions everybody to "remember the weight." *Id.* at 11. During the meeting, the Defendant also explains his plan, stating that he will "see if customs is really watching" the flight carrying drugs. *Id.* at 25. And while the Defendant refuses to commit without conferring with his team, he does state "it is good, if you're saying it is what it is," suggesting that he is "readily avail[ing] himself of the opportunity to perpetrate the crime." *Id.* at 13; *Cromitie*, 727 F.3d at 215 (quotation omitted). From this evidence alone, the jury could have reasonably concluded that the Defendant was predisposed to engage in a narcotics conspiracy.

The Defendant argues that the above statements are inadmissible to prove predisposition because they were made in response to the Government's inducement, but this is not so. It is true "that conduct of a defendant, after contact by Government agents, offered to prove predisposition, must be independent and not the product of the attention that the Government had directed" towards the defendant. *Id.* at 209 (quotation omitted). But "what a defendant says after [being] contacted by agents is generally admissible to prove predisposition because,

although some post-contact conduct might be the product of inducement, it will be a rare situation where a defendant can plausibly claim that the inducement caused him to say something that evidenced predisposition." *Id.* The Defendant's statements therefore were admissible to show predisposition.

Beyond the October 27, 2017 meeting, there was further evidence of predisposition. On the morning of the would-be transaction, the Defendant, apparently while discussing a plan to hold back some of the drugs states on a wiretapped call: "You ain't got nobody on your back . . . tell them to go suck their mother. We don't have anybody on our backs." GX 409T at 6. Later that day, the Defendant resolves to hold back some of the drugs, stating repeatedly "I am not letting you walk in there with all of it." GX 413T at 6. This evidence is particularly probative of predisposition, because it shows a desire on the part of the Defendant to go beyond what the Government had attempted to induce. It is evidence of an independent intent to commit a crime that is "the product of his own preference." *Cromitie*, 727 F.3d at 215 (quoting *United States v. Williams*, 705 F.2d 603, 618 (2d Cir. 1983)). Finally, the Defendant brought a firearm to the transaction, which is a tool of the narcotics trade. He had a special compartment in his car for his firearm and expressed a willingness to use the gun if necessary. *See* Tr. 133, 602. This is all further evidence of the Defendant's experience in narcotics.

The Defendant argues that he was in fact reluctant to engage in the drug trafficking operation. He points to text messages that appear noncommittal or cryptic in response to Williams's inquires about drug trafficking. These messages were sent in the months after the October meeting. As an initial matter, "moments of wavering . . . do not preclude a finding of predisposition." *Id.* Moreover, the jury was entitled to interpret these text messages as merely communicating a reluctance to talk about drug trafficking in written form or maybe at that

particular time. At other points, the Defendant expressed impatience with the Government agents, and told Williams that he was considering working with another drug trafficking conspiracy instead. GX 206 at 13 ("Dem can't crowd every lane especially if someone else will pay full fare."). Whatsapp messages from Williams also show that the Defendant attempted to move up the date of the drug trafficking. GX 810 at 2. The jury could have reasonably found that the Defendant's intent to go through with the drug trafficking conspiracy remained strong in this intermediate period.

In short, there is a bevy of evidence from which jury could have concluded beyond a reasonable doubt that the Defendant was predisposed to commit this crime. The Defendant's sufficiency of the evidence challenge fails.

## B.     If a Manufactured Venue Defense Exists, This Case Does Not Implicate It

The Defendant next moves for a new trial on the grounds that he was improperly precluded from asserting a manufactured venue defense.[2] At trial, the Defendant requested the following instruction: "Venue is not proper if you find that the only facts establishing venue in the Southern District of New York were injected into the charged conspiracy by the Government, including through its informants, solely for the purpose of creating venue in this District." Dkt. No. 94, at 30-31. Judge Sweet refrained from giving this instruction, because he concluded that no manufactured venue defense existed in the Second Circuit. He likewise precluded the Defendant from presenting a manufactured venue defense.

"A conviction will not be overturned for refusal to give a requested charge, however, unless that instruction is legally correct, represents a theory of defense with basis in the record

---

[2] In his reply, he also suggests that this may be a Rule 29 issue. For the same reasons the Court concludes that a new trial is not warranted, it concludes that this case should not be dismissed because the Government improperly relied on manufactured venue.

that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge." *United States v. Vasquez*, 82 F.3d 574, 577 (2d Cir. 1996). Additionally, a failure to properly instruct a jury will be disregarded if it was plainly harmless. *See United States v. Rommy*, 506 F.3d 108, 124 n.10 (2d Cir. 2007) ("[H]armless error analysis can be applied to a possible charging omission with respect to venue."). As discussed above, there were two events that the jury could have relied upon to find venue in this District: the 2013 trip and the 2018 communication. The Defendant contends as a factual matter that the Government orchestrated the 2018 communication from Manhattan for the purpose of establishing venue. However, as explained below, even if the Defendant's version of events with respect to the 2018 communication is correct, the Court finds that it would not constitute a legally valid manufactured venue defense—assuming that there is such a defense in this Circuit. There was thus no need to instruct the jury on manufactured venue.

The Second Circuit has "had no occasion conclusively to decide the availability of [a manufactured venue] defense." *Id.* at 127. Rather, it has repeatedly recognized the *possibility* that the defense exists. In *United States v. Meyers*, the court acknowledged possible "concerns if a case should arise in which key events occur in one district, but the prosecution, preferring trial elsewhere, lures a defendant to a distant district for some minor event simply to establish venue." 692 F.2d 823, 847 n.21 (2d Cir. 1982). Similarly, in *United States v. Ramirez-Amaya*, the Second Circuit stated, in *dicta*, that it "would be loath to uphold venue on the basis of the flight path of an aircraft [trafficking drugs] manned solely by government agents if there were an indication that its route had been significantly out of the ordinary, considering its point of departure and its destination." 812 F.2d 813, 816 (2d Cir. 1987).

Subsequent cases have avoided the question of whether the defense in fact exists. For example, in *United States v. Rutigliano*, the court suggested that if a manufactured venue defense was available, "the concern over a distant district" would be "critical." 790 F.3d 389, 399 (2d Cir. 2015) (quotation omitted). It concluded that the events of that case that gave rise to venue in the Southern District of New York, as opposed to the Eastern District, did not constitute "lur[ing] to a faraway land," and that "there is no basis to conclude that the government preferred to try these defendants in the Southern District (instead of the Eastern District)." *Id. See also, Rommy*, 506 F.3d at 127 (Defendant "selected the district as the destination objective of the charged conspiracy"); *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) ("The Government 'did not orchestrate the phone call in order to lay the groundwork for venue' in the Southern District.") (quoting *United States v. Lewis*, 676 F.2d 508, 511 n.3 (11th Cir. 1982)). Other circuits have rejected a manufactured defense doctrine outright, finding that concerns about venue shopping are properly addressed by a Rule 21 motion to transfer. *See, e.g., United States v. Celaya Valenzuela*, 849 F.3d 477, 488 (1st Cir. 2017); *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 462 (7th Cir. 2006).

The most recent case in which the Second Circuit rejected a manufactured defense was *Tang Yuk*. There, venue was based in part on a phone call by an informant, made at the Government's direction in Manhattan, that was in furtherance of a drug trafficking conspiracy. *Tang Yuk*, 885 F.3d at 72 n.3. Unlike in this case, the defendants in *Tang Yuk* did not request that the jury be instructed on manufactured venue. Instead, the contention was that the evidence of venue was legally insufficient because it only showed that venue was manufactured. The court rebuffed this argument. It noted that prior to the call, a co-conspirator had "voluntarily entered the S.D.N.Y. when he transported cocaine over the Verrazano-Narrows Bridge on his

way to Queens." *Id.* The Government had not overreached because the co-conspirator had "independent of government action, brought 25 kilograms of heroin to the New York metropolitan area" from Florida, where the defendants were located. *Id.* Therefore, "the S.D.N.Y.'s connection to the unlawful activity predates the government's active involvement in New York." *Id.*

The Court reads these cases as holding out the possibility of a narrow manufactured venue defense for circumstances more extreme than the ones here. The Defendant was not tried in a "distant district" but rather one adjacent to the District of New Jersey. *Meyers*, 692 F.2d at 847 n.21 (2d Cir. 1982). As the *Rutigliano* court noted, the "concern over a distant district" would be paramount in a hypothetical manufactured venue defense, and the Southern District was no more of a "faraway land" in this case than it was in that one. 790 F.3d at 399. Likewise, it was not "significantly out of the ordinary" that law enforcement in the Southern District of New York would be concerned about drug trafficking through one of the New York metropolitan area's major airports. *Ramirez-Amaya*, 812 F.2d at 816. The *Tang Yuk* court appeared to find it important that the co-conspirator in that case had not only transported drugs through the Southern District specifically, but had "brought 25 kilograms of heroin to the *New York metropolitan area*" as his final destination. 885 F.3d at 72 n.3 (emphasis added). Unlike in *Tang Yuk*, the vast majority of the drug trafficking conspiracy in this case occurred in the New York metropolitan area. And while *Tang Yuk* involved a volitional act in the Southern District that predated the Government's involvement, the Court does not read that case as *requiring* such an act for venue to be proper. The *Tang Yuk* opinion itself noted that it "need not address" the hypothetical scenario of whether the Government could have manufactured venue in South Dakota instead of the Southern District. *Id.*

The Defendant's requested instruction, by failing to limit the manufactured venue defense to cases involving distant districts or other exceptional circumstances, was therefore not "legally correct." *Vasquez*, 82 F.3d at 577. Additionally, there is no "basis in the record" to support a manufactured defense as it might exist. *Id.* Judge Sweet correctly refrained from giving the Defendant's requested instruction. He likewise properly precluded the Defendant from presenting a manufactured venue defense. Therefore, the motion for a new trial on this basis is denied.

### C.     The Jury Was Properly Instructed on Entrapment

At trial, the Defendant requested but did not receive the following jury instruction on entrapment:

> The government cannot rely on conduct that was induced by government agents to prove that the defendant was predisposed to commit the charged crime, but the government may introduce post-inducement conduct to establish predisposition by showing the defendant promptly availed himself of a government sponsored opportunity to commit a crime

Tr. 1158:2-8. This language is taken directly from *United States v. Baez*, 761 F. App'x 23, 26 (2d Cir. 2019). Judge Sweet instead instructed the jury that "[p]redisposition is measured independently from the government's inducement." Tr. 1326:5-7.

The Court agrees with Judge Sweet that the Defendant's requested instruction is "substantially the same thing" as what the jury was actually told. Tr. 1159:14-15. As noted above, a failure to give a jury instruction is improper only if "the theory is not effectively presented elsewhere in the charge." *Vasquez*, 82 F.3d at 577. The predisposition inquiry focuses on the defendant's state of mind. It ensures that a defendant's decision to commit a crime was his own and not the product of the Government's "tempting innocent persons into violations." *Sherman v. United States*, 356 U.S. 369, 372 (1958); *see also Sorrells v. United States*, 287 U.S.

435, 442 (1932) ("A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute."). The fact that a defendant performed an act induced by the government shows that he developed the intent to commit that act. But it tells us little about how that intent came about. That is why "the Government cannot rely on conduct that was induced by government agents to prove that a defendant was predisposed to commit the charged crime." *Baez*, 761 F. App'x at 26. The Court sees no material difference between telling the jury that "[p]redisposition is measured independently from the Government's inducement" and telling the jury that they cannot "rely on conduct that was induced by Government agents" to find predisposition. Tr. 1326:5-7; Tr. 1158:2-8. It would be impossible for the jury to measure predisposition independently from the Government's inducement if they rely on induced conduct.

Furthermore, there appears to have been little danger that the jury would rely on induced conduct. The Government's evidence of predisposition did not constitute induced conduct. The Defendant counters that the Government did use statements in response to its inducement to prove predisposition, such as those made during the October 27, 2017 meeting. But as noted above, "what a defendant says after [being] contacted by agents is generally admissible to prove predisposition." *Cromitie*, 727 F.3d at 209. It was therefore proper for the jury to rely on these statements to find predisposition. Judge Sweet's jury instruction on entrapment was correct.

### D. The Inclusion of Firearms Evidence and Exclusion of Williams's Post-Arrest Statement Do Not Warrant a New Trial

The Defendant next moves for a new trial on the basis that: 1) the court improperly admitted evidence of Woolaston's prior unlawful purchase of a firearm and evidence of a cache

of firearms and ammunition recovered from his residence on the day of his arrest; and 2) improperly excluded video of Williams's post-arrest statement. A new trial is not warranted.

First, the Defendant argues that the firearms cache was not admissible to prove the narcotics conspiracy under both Rule 403 and Rule 404(b). The Court disagrees.

Rule 404(b) allows the introduction of other acts and crimes evidence to prove things other than the defendant's criminal propensity. It also allows the introduction of uncharged criminal activity, provided that the activity "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni,* 204 F.3d 39, 44 (2d Cir. 2000). Such prior acts must generally "share a common temporal element" and a "unique locus" to the charged conduct. *United States v. Brand*, 467 F.3d 179, 200 (2d Cir. 2006). At the same time, however, evidence of a defendant's possession of a firearm is generally admissible as direct proof of a narcotics conspiracy charge because firearms are tools of the narcotics trade. *See, e.g., United States v. Vegas,* 27 F.3d 773, 778 (2d Cir. 1994) ("[T]his Court has repeatedly approved the admission of firearms as evidence of narcotics conspiracies, because drug dealers commonly keep firearms on their premises as tools of the trade.") (quotation omitted).

The Defendant argues that the tools-of-the-trade argument is not available here because Williams testified that he was unaware of any connections between the Defendant's firearms cache and drug trafficking. *See* Tr. 812-814. However, the Government did not have to introduce evidence directly connecting the firearms and the narcotics conspiracy for the firearms evidence to be admissible. Rather, the firearms are themselves standalone evidence of the existence of the narcotics conspiracy. *See United States v. Marmolejas*, 112 F. App'x 779, 783

(2d Cir. 2004) (affirming admission of weapons recovered from van at time of arrest on "tools of the trade" theory notwithstanding no evidence of connection to offense). For example, in *United States v. Muniz*, the Second Circuit held that evidence of a gun found in the defendant's apartment was admissible to prove narcotics trafficking. 60 F.3d 65, 71 (2d Cir. 1995). Even though there was no evidence directly connecting the gun to the narcotics conspiracy, "defendant's possession of the gun was relevant" because it "showed that at the time he was charged with possession of the heroin, he had equipped himself with a tool of the narcotics trade." *Id.*; *see also United States v. Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir. 1990) ("Evidence of [the] possession [of narcotics tools of the trade] at a closely related time is relevant to the charged conspiracy and not a mere showing of bad character, even if it relates to transactions outside the scope of the indictment.").

Nor is it clear that the Government failed to present a connection between the cache and the narcotics conspiracy, as there was evidence that some of the sham cocaine was stored in the safe, and that the safe contained ammunition for the weapon brought by the Defendant to the drug transaction. Tr. 80:24-81:2, 582:12. The Second Circuit has found firearms evidence to be especially probative in narcotics conspiracy cases when the firearms are stored in the same container as drugs or drug paraphernalia. *See Vegas*, 27 F.3d at 779; *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir. 1976). Furthermore, there was reason to believe that Williams lacked full knowledge of the purpose of the cache, since he testified that he was generally unfamiliar with it. Tr. 774-775.

The prior firearms purchase was likewise admissible under a tools-of-the-trade theory. Just as the contemporaneous firearms cache is evidence of the charged narcotics conspiracy, a prior illegal firearms purchase is evidence of past narcotics conspiracies. And "evidence of . . .

an existing course of criminal conduct similar to the crime for which [the defendant] is charged"
is probative of the Defendant's predisposition. *Brunshtein*, 344 F.3d at 101 (quotation omitted).
Testimony that the Defendant "was in possession of [a] tool[] of the drug trade," was therefore
"evidence that [the Defendant] was predisposed to traffic in narcotics." *United States v. Ray*,
367 F. App'x 478, 480-81 (4th Cir. 2010).

Moreover, the Defendant fails to identify prejudice resulting from the admission of the
weapons. The prejudicial effect of evidence is reduced when it "[does] not involve conduct any
more sensational or disturbing than the crimes with which [the defendant] was charged."
*Roldan-Zapata*, 916 F.2d at 804. At trial, the Government alleged that the Defendant had a
firearm on in him at the time of his flight from law enforcement. Tr. 53-54. They also
introduced statements by the Defendant concerning the use of firearms, such as his willingness to
"come in there blazing" if Williams encountered difficulties during the drug transaction. GX
413T; Tr. 594-602. This evidence rendered the admission of additional weapons evidence
nonprejudicial.

Finally, the Defendant argues that the Court improperly barred the Defendant from
introducing parts of Williams's arrest video to impeach him. However, "[a]n erroneous ruling on
the admissibility of evidence" does not mandate a new trial if the Court "can conclude with fair
assurance that the evidence did not substantially influence the jury." *United States v. Rea*, 958
F.2d 1206, 1220 (2d Cir. 1992). Here, even if the video footage should have been admitted, it
did not generate enough prejudice by itself to require a new trial. The Defendant was allowed to
develop almost all of the same impeachment theories at trial, just not with actual video footage.
First, he sought to use the video evidence to prove that Williams appeared lucid during the
interview. But the Defendant was allowed to elicit uncontroverted testimony of Williams's

lucidity from a case agent who attended the interview. *See* Tr. 1056:25-1057:5. The Defendant also wanted to use the video to prove that Williams was promised benefits in exchange for his cooperation. However, defense counsel did in fact question the case agent about these promises, *see* Tr. 1041-56, and was even permitted to play part of the interview video that pertained to these promises. Tr. 1050. Lastly, the Defendant planned on using the video footage to prove that Williams made statements at the interview that were inconsistent with his testimony. However, the defense was given the opportunity ask Williams about his prior inconsistent statements, such as his claim at the interview that the Defendant made weekly drug runs. Tr. 694:21-695:5.

Because the video footage "would have been merely cumulative evidence," its exclusion did not prejudice the Defendant enough to, by itself, require a new trial. *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991); *see also United States v. Palermo*, 291 F. App'x 418, 420-21 (2d Cir. 2008). Defense counsel conceded this lack of prejudice at oral argument. Oral Arg. Tr. 23:10-11 ("Now, standing alone, is that enough for a new trial? I'm not going to sit here and say that it was.").

## IV. CONCLUSION

For the above reasons, the Defendant's Rule 29 and Rule 33 motions are DENIED. The Court will schedule the Defendant's sentencing by separate order.

This resolves Dkt. No. 122.


SO ORDERED.

Dated: January ____, 2020
       New York, New York

_____

ALISON J. NATHAN
United States District Judge