UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

TYRONE WOOLASTON

Defendant.

18 Cr. 212 (AJN)

---

**SENTENCING MEMORANDUM
ON BEHALF OF DEFENDANT TYRONE WOOLASTON**

**SHEARMAN & STERLING LLP**
Christopher LaVigne
Robert Lewis
Liz Robinson
599 Lexington Avenue
New York, NY 10022
(212) 848-4432 (telephone)
(646) 848-4432 (facsimile)

October 29, 2020
New York, NY

*Attorneys for Defendant Tyrone Woolaston*

**Via ECF**

October 29, 2020

The Honorable Alison J. Nathan
Thurgood Marshall United States Courthouse
40 Foley Square, Room 2102
New York, NY 10007

RE:     *United States v. Woolaston*, 1:18-cr-00212-AJN (S.D.N.Y.)

Dear Judge Nathan:

We respectfully submit this sentencing memorandum on behalf of Tyrone Woolaston, who is scheduled to be sentenced on November 5, 2020. For the reasons set forth below, we request that the Court sentence Tyrone to 15 years' imprisonment, which is the mandatory minimum sentence and the same sentence recommended by the U.S. Probation Office ("Probation").

While there are a number of disputed issues under the United States Sentencing Guidelines (the "Guidelines"), there can be little dispute about Tyrone's background and positive attributes. At the time of the offense, Tyrone was working two full-time jobs (including as a fireman where he served the City of Orange with honor for five years); was the sole custodian for his young daughter; was college educated; had no criminal history; and was respected and revered by his family and friends. After the offense, Judge Sweet recognized these attributes and made the highly unusual decision to grant Tyrone bail despite the mandatory minimum sentences Tyrone faced. Tyrone complied with all pre-trial conditions. And even after his conviction, Tyrone has been a model inmate. He has served as a GED tutor for inmates, worked various jobs at the Metropolitan Correctional Center (the "MCC"), and earned the respect of correctional officers, who submitted letters of support on his behalf.

The offense does not reflect who Tyrone is, or his body of work over the last 37 years. That is why Probation recommends a non-Guidelines sentence of 15 years' imprisonment. Because "[w]hen taken as a whole . . . the defendant's lack of criminal history, strong ties to his family and community, and stable employment history" warrant such a sentence. PSR at 28. While Tyrone stands convicted of serious crimes, he should be given credit for the good deeds he has done, the dedication to his family, friends, and community that he has demonstrated throughout his life, and his potential to do good after incarceration.

At the time of this Submission, the Government has sought two separate Guidelines enhancements that would increase Tyrone's Guidelines range to 20 years. These enhancements are based purely on Tyrone's job as a baggage handler at United Airlines ("UA"), which the Government contends was an "abuse of a position of trust," and piling on additional drug weight beyond the five kilograms involved in the Government-initiated, reverse Sting operation.

Neither have merit.  Regarding the former, Tyrone's role as a baggage handler does not involve the "substantial discretionary judgment that is ordinarily given considerable deference" for this enhancement to apply.  *See* U.S.S.G. § 3B1.3.  Regarding the drug enhancement, the Government seeks additional drug weight based on incredible and uncorroborated cooperating witness testimony.  This case was and is about a five-kilogram Sting.  While we do not contest that amount for purposes of sentencing, the additional amount cited by the Government cannot be established by a preponderance of the evidence.

As discussed below, the full circumstances surrounding the Sting warrant a departure or variance from the Guidelines under the imperfect entrapment doctrine.  Put simply—we would not be here today, and Tyrone would not be facing a draconian 15 year mandatory minimum sentence (or a potentially higher Guidelines range), had the Government not initiated this aggressive Sting.

Regardless of the final Guidelines calculation, this is a textbook case for a faithful application of Title 18, United States Code, Section 3553(a).  The 25 letters of support we appended are from people who have known Tyrone throughout his entire life—from childhood, to student, to father, to fireman, and to inmate.  All speak to his strong character, which has continued even through this harrowing chapter of his life.  Even the minimum sentence in this case is one that is far greater than necessary to serve the interests of justice.  Justice is not served by a higher sentence.

## I.     Background

Tyrone is a 37-year-old New Jersey native who was convicted of two offenses following a jury trial:  (1) conspiracy to distribute and possess with the intent to distribute cocaine, in violation of 21 U.S.C. § 846 and 841(b)(1)(A) (Count 1); and (2) using and possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 2).

The convictions relate to a U.S. Homeland Security Investigations ("HSI") investigation that spanned three years.  Starting in May 2015, the investigation targeted Mr. Williams and required the involvement of two separate confidential sources ("CS").  After constant badgering from CS-2 from June 2015 through the Fall of 2017, Mr. Williams enlisted Tyrone to assist with the delivery of narcotics through the Newark International Airport (the "Airport").  The reverse Sting culminated in a controlled delivery and take-down on February 11, 2018.  Mr. Williams was arrested at the scene and immediately began cooperating with the Government.  Tyrone fled the scene and self-surrendered to law enforcement the following day.

After being detained for six months, Judge Sweet granted counsel's bail application on September 28, 2018.  Tyrone complied with all pretrial restrictions.  At trial, Judge Sweet found as a matter of law that the Government induced the conduct at issue in this case.  On February 21, 2019, the jury rejected that defense and convicted him of both counts.  Tyrone now faces a sentence that is 12 years higher than his alleged co-conspirator and cooperating witness, whose assistance appears to have amounted to testifying against Tyrone.

## II. The Appropriate Sentence Is 180 Months' Imprisonment

The appropriate Guidelines range for Tyrone is 157-181 months' imprisonment. This is based on a Guidelines range of 97-121 months on Count 1 and 60 months on Count 2, which must run consecutively to Count 1. Because Tyrone faces a mandatory minimum sentence on both counts, the appropriate adjusted Guidelines range is 180-181 months' imprisonment. For the reasons that follow, we respectfully request a sentence that is consistent with Probation's recommendation of 180 months' imprisonment.

### A. <u>Legal Standard</u>

After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 264 (2005), the Guidelines are no longer mandatory. "[T]he Guidelines should be the starting point…" for determining the proper sentence, not necessarily the final decision. *Gall v. United States*, 552 U.S. 38, 49 (2007). It is settled law that courts have broad discretion to determine the sentence and are not bound by the Guidelines, nor are the Guidelines "presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010) ("In conducting this review [of the Section 3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the Guidelines are guidelines – that is, they are truly advisory") (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (requiring district courts not to presume that a Guidelines sentence is reasonable for any particular defendant and to conduct an "independent review of the sentencing factors" in all cases for each defendant) (internal quotation marks omitted).

The goal is to fashion a sentence that is sufficient, but not greater than necessary, to effectuate the goals of sentencing. 18 U.S.C. § 3553(a). In doing so, courts may consider "any and all information that reasonably might bear on the proper sentence for the particular defendant." *United States v. Juwa*, 508 F.3d 694, 700 (2d Cir. 2007) (quoting *Wasman v. United States*, 468 U.S. 559, 563 (1984)); *see also Urena v. United States*, Nos. 06 Civ. 6050 (JFK), 04 Cr. 1336 (JFK), 2007 WL 2319136, at *2 (S.D.N.Y. Aug. 8, 2007) (Keenan, J.).

### B. <u>The Guidelines and PSR</u>

Probation calculated the Guidelines range to be 211 to 248 months' imprisonment. Probation's calculation is driven by two enhancements: (1) an abuse of a position of trust, pursuant to Section 3B1.3 of the Guidelines; and (2) a drug quantity of between 15 and 50 kilograms of cocaine, pursuant to Section 2D1.1(c)(5) of the Guidelines. Each enhancement bears on the Guidelines range for Count 1. Collectively, each enhancement would increase the Guidelines range on this Count from 97-121 months to 151-188 months (almost five years at the high range). And individually (assuming one of the enhancements apply), each enhancement would increase the Guidelines range from 121-151 months to 151-188 months (three years at the high range) on this Count.

#### 1. The Abuse of Position of Trust Enhancement Is Not Warranted

Section 3B1.3 of the Guidelines—entitled "Abuse of Position of Trust or Use of Special Skill"—calls for a two-level enhancement if a defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."

U.S.S.G § 3B1.3. Application Note One explains that a position of "public or private trust" is one that is "characterized by *professional or managerial discretion (i.e. substantial discretionary judgment that is ordinarily given considerable deference.*"). U.S.S.G. § 3B1.3, cmt. n. 1 (emphasis added).

Persons afforded such positions "ordinarily are subject to *significantly less supervision* than employees whose responsibilities are primarily non-discretionary in nature." *Id.* (emphasis added)*;see also United States v Thorn,* 317 F.3d 107, 122 (2d Cir. 2003) (characterizing position of trust as "professional or managerial discretion and lack of supervision"); *United States v. Viola,* 35 F.3d 37, 45 (2d Cir. 1994) (citing Section 3B1.3 and declining to impose enhancement because defendant's position "did not involve a substantial amount of discretionary judgment, and he was not subject to relaxed supervision because of the position") *abrogated on other grounds by Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). "Whether a position is one of 'trust' within the meaning of § 3B1.3 is to be viewed from the perspective of the offense victims[.]" *United States v. Huggins,* 844 F.3d 118, 124 (2d Cir. 2016) (quoting *United States v. Wright*, 160 F.3d 905, 910 (2d Cir.1998)); *see United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996) ("Limiting an enhancement for abuse of trust to the misuse of discretionary authority entrusted by the victim or on the victim's behalf is consistent with the examples given in the commentary.").

Section 3B1.3 provides examples of what does and does not constitute a position of trust. The enhancement does not, for example, apply "in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors." U.S.S.G. § 3B1.3, cmt. n. 1. By contrast, the enhancement does apply to classic fiduciaries, such as in "the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." *Id.*

### Tyrone Did Not Hold A Position of Trust

The PSR's conclusion that this enhancement is warranted (PSR ¶ 33)—which has the potential to increase Tyrone's sentence by almost three years—is predicated on Tyrone's roles as a "lead baggage handler" at UA, and a cursory claim that "not only did he have to go through the heightened security that all baggage handlers must go through to get ramp access, but he had a heightened degree of freedom and discretion when he was on the tarmac." PSR at 23. These "findings," endorsed by the Government, do not come close to satisfying the standard for a position of trust. They also are directly contrary to various holdings that declined to impose this enhancement on airline or airport employees with positions to Tyrone.[1]

From the perspective of the purported victim (apparently UA, although neither the Government nor Probation has even identified one), Tyrone did not have "substantial discretionary authority." Trial testimony unequivocally established this and neither Probation nor the Government put forward evidence to the contrary.

---

[1] Throughout this memorandum, "Tr." refers to the trial transcript; "DX" refers to Defense Exhibits introduced at trial; "GX" refers to Government Exhibits introduced at trial; and "PSR" refers to the Probation Department's Pre-Sentence Investigation Report.

Tyrone was a UA baggage handler. His responsibilities were to help steer airplanes in and out of the gates at the Airport and to assist a group of two to three other baggage handlers with loading and unloading baggage to or from flights. Tr. at 394-95 (testimony from Carolyn Keith, UA supervisor); *id.* at 399; *id.* at 892 (testimony from Alicea Rendon, UA representative). Tyrone had zero authority to assign UA employees to work on certain days or shifts, Tr. at 184, nor did he have any authority to assign employees or himself to work at specific gates. *Id.* at 411, 416. Only supervisors could do that. *Id.* at 391, 411. Supervisors directed Tyrone on where to work, when to work, and with whom to work. Tr. at 416, 417. Jeffrey Jackel, the Investigations Manager at UA, point blank testified that Tyrone was "not a supervisor." Tr. at 144.

Further, far from operating with substantial discretion, Tyrone (like other UA baggage handlers) was subject to strict controls, including video monitoring, checkpoints, and Customs inspections. Tr. at 136-37, 140, 151-52 (explaining video surveillance on ramp "to monitor the operations"); *Id.* at 158 (describing checkpoint procedures for baggage handlers, including video surveillance, card swiping, physical checks and inspections), *Id.* at 160-61; 411 (explaining Customs inspections of baggage handlers at gates); GX 514. Further, HSI has a dedicated unit devoted to surveilling Airport employees, and also investigated the alleged conduct at issue in this very case. Tr. 194.

### The Government's and Probation's Guidelines Position Is Wrong

At the Government's urging, Probation takes snippets of trial testimony wholly out of context, claiming that UA employees testified that Tyrone had a "leadership role on the ramp," and that he was "responsible for managing the other baggage handlers," and then appears to rely on the simple fact that Tyrone had access to secure areas. PSR at 23. Not only is this a factual mischaracterization, but the proffer does not suffice as a matter of law.

*First,* Probation's claim that Tyrone had a "leadership role" is based on his title as a "ramp service team leader." But as noted above, the enhancement is "misuse of discretionary authority *entrusted by the victim.*" *Jolly*, 102 F.3d at 48 (2d Cir. 1996) (emphasis added). The focus is therefore on the actual discretionary authority entrusted to the defendant, rather than mere titles. The actual testimony from UA representatives shows that this enhancement is inapplicable.

A "team leader" is usually the head baggage handler and gate facilitator for a group of two to three baggage handlers that are assigned to a gate. Tr. at 183, 394 (explaining that the team leader stands at the front of the footbridge to guide the flight, whereas other team members stand on the sides), 892. This title is nominal. There are about 200 team leads every day, baggage handlers get assigned or upgraded every single day, and at most it causes team leaders to get an extra dollar an hour. *Id. at* 183, 410-11 (Keith testimony that there are "a lot" of team leaders and that "every day [UA] upgrading somebody to be a team leader."). Two separate UA witnesses testified that a team leader is not a supervisor and does not have discretionary authority (such as having the ability to assign UA employees to gates, times, places, or shifts). *Id.* at 184, 410-11. And all baggage handlers (regardless of title) have the exact same level of access to the Airport ramp or secured areas. *Id.* at 394.

Moreover, numerous courts have rejected attempts to expand coverage of the abuse of position of trust to employees like Tyrone. In *United States v. Parrilla Roman*, 485 F.3d 185, 192 (1st Cir. 2007), for example, the court found that airport fleet service clerks—whose duties also included loading cargo on and off aircrafts and guiding planes through arrivals and departures—did not occupy "positions of trust." The court found that "nothing in the record suggests that [clerks] toiled under minimal supervision" and that "the kinds of tasks typically required of fleet service clerks (e.g., loading and unloading cargo, cleaning cabin interiors, and guiding taxiing aircraft) are the kinds of tasks that almost invariably require oversight." *Id.* at 192. As such, fleet service clerks are "on par with . . . the bank teller and hotel clerk positions identified by the Sentencing Commission as non-trust positions." *Id.* at 192 (citing U.S.S.G. § 3B1.3, cmt. n. 1).

The court further concluded that a contrary interpretation "turns the guideline on its head: it does not follow that, merely because a defendant's position enables him to commit an offense, the position must have been unsupervised and, thus, a position of trust." *Id.* at 191*; see also United States v. Correy*, 570 F. 3d 373, 395 (1st Cir. 2009) (finding (after Government confession of plain error) that district court committed plain error in holding that airport janitor held a position of trust; while defendant's "job enabled him to commit the crime, [it] did not afford him any "professional or managerial discretion."); *United States v. Douglas,* 885 F.3d 124, 134, 136 (3d Cir. 2018) (holding that UA terminal mechanic was not a position of trust; mechanic's duties were not "characterized by professional or managerial discretion" and "even if [the defendant] did possess the requisite decisionmaking [sic] authority, the record simply does not show that he exercised it free from supervision"). *Cf. Viola*, 35 F.3d at 45 (finding that defendant's position as a forklift operator was not a position of trust since it "did not involve a substantial amount of discretionary judgment, and he was not subject to relaxed supervision because of the position.").

*Second,* Tyrone's access to restricted areas by virtue of his employment at UA does not transform Tyrone's role into one of a position of trust. As referenced above, the focus is on the *discretion* Tyrone was given in the performance of his duties, not the particular *access* to areas he had. Probation's citation to Tyrone's possession of a Security Identification Display Area ("SIDA") card (PSR 15) is of no moment. Every Airport employee is issued such an access card. *See* Tr. at 40 (HSI agent testifying that "any kind of vendor" at the Airport gets a SIDA card); *id.* at 429 (Jane Christensen, Airport Security Manager, testifying that any Airport employee with "business at the airport" is issued a SIDA card and approximating that 22,000 individuals had such access).

And, courts have rejected such overbroad attempts to categorize any airport employee as holding a position of trust. *United States v. Adams*, No. 03 Cr. 1368 (ARR), 2006 WL 229904 (E.D.N.Y. Jan. 31, 2006), is on all fours. There, the court found that dozens of baggage handlers and their supervisors at JFK Airport, allegedly involved in a similar purported scheme to smuggle narcotics through JFK, did not occupy a position of trust. *Id.* at *8 ("JFK airport

employees are not in positions of trust.").[2]  In so holding, the court not only agreed that "defendants' positions lacked the discretionary capacity required to satisfy the definition of 'position of trust' under the Sentencing Guidelines," *id*. at *5, it also rejected the "rather sweeping argument that all airport employees with SIDA badges occupy positions of trust." *Id.* at *6.

Like here, the court emphasized that baggage handlers were subject to monitoring and oversight, including through video surveillance, Customs and law enforcement inspections, and inspections of planes.  *Id*. (concluding that "monitoring of airport employees was frequent" and "airport employees, *in spite of their security clearances, were not trusted to freely access the tarmac and other secured area of JFK Airport*") (emphasis added).  This demolishes Probation's finding that a Section 3B1.3 enhancement is warranted because Tyrone purportedly "had a heightened degree of freedom and discretion when he was on the tarmac."  PSR at 23; *see also Parrila Roman*, 485 F.3d at 191 (rejecting argument that the "defendants' ready access to restricted areas of the airport" warranted a Section 3B1.3 enhancement); *Douglas*, 885 F.3d at 135-36 (denying abuse of position of trust enhancement based on UA mechanic's receipt of a security badge that allowed him to smuggle narcotics without going through TSA checkpoints; "[T]he Government has shown only that Douglas's access to the airport terminal helped him commit the offence [but] it has not demonstrated that Douglas's position at the airport was characterized by professional or managerial discretion.").

Put another way, baggage handlers are not like lawyers, physicians, or executives who are permitted to serve their job functions with little oversight and are entrusted to exercise their discretion in an appropriate manner.  At bottom, the record simply does not establish by a preponderance of the evidence that an enhancement under Section 3B1.3 is warranted.  *See United States v. Salim*, 287 F. Supp. 2d 250, 305-06 (S.D.N.Y. 2003).

## 2.  The 15-50 Cocaine Kilogram Enhancement Does Not Apply

Probation determined that the narcotics conspiracy involved 20 kilograms of cocaine, attributable to the Sting and two separate transactions: (1) a 2015 attempt to smuggle five kilograms of cocaine through the Airport, PSR ¶ 12, and (2) a 2013 successful transaction that involved either 5 or 10 kilograms of cocaine through the Airport (depending on which version of Mr. Williams' testimony is credited).  PSR ¶ 22, PSR at 22-23.  Probation therefore assigned an offense level of 32 for Count 1.  *See* U.S.S.G. § 2D1.1(c)(4) (assigning offense level of 32 if the offense involved "at least 15KG but less than 50KG of cocaine").

This is wrong.  The proper offense level is 30 because the offense involved 5 kilograms of cocaine.  *See* U.S.S.G. § 2D1.1(c)(5) (assigning offense level of 30 if the offense involved "at least 5KG but less than 15KG of cocaine").

*First*, the 2015 transaction cited by Probation involved a separate and unsuccessful HSI Sting in the summer of 2015 that purportedly was for five kilograms of cocaine.  PSR ¶¶ 12-13.  There was no direct evidence linking Tyrone to this transaction other than Mr. Williams's self-

[2] A DEA press release summarizing the facts and roles of the defendants is at the following link: https://www.dea.gov/sites/default/files/pubs/states/newsrel/nyc112503.html (last visited October 29, 2020).

serving testimony. Mr. Williams claimed that Tyrone told him on August 14, 2015 that "the flight was a red flag." Tr. at 454; PSR ¶ 13. The Government's theory was contradicted by trial evidence that unequivocally established that Tyrone was not even working at the Airport on that day or time-frame. *See* Tr. at 887 (UA witness authenticating and presenting UA employment records that showed Tyrone was not working at the Airport from July 19, 2015 through September 24, 2015); PSR ¶ 13.

The testimony of Mr. Williams was also patently incredible on countless points. *See, e.g.*, Memorandum of Law in Support of Tyrone Woolaston's Motion for a New Trial, *United States v. Woolaston*, No. 1:18-cr-00212-RS, ECF No. 123 at 7-8 ("Woolaston Motion") (showing dramatic inconsistencies in Mr. Williams' testimony including misstatements about the scope of alleged prior transactions and dealings with Tyrone and, incredibly, Mr. Williams's sudden bout of "amnesia" during his testimony). Accordingly, the Government has not met its burden in proving that this so-called transaction for five kilograms should be attributable to Tyrone's offense level.

*Second,* even if the Court chooses to hold Tyrone responsible for the 2015 transaction (which it should not), then Tyrone would only be responsible for trafficking 10 KG of cocaine (PSR ¶¶ 12, 15, 16, 19), still well below the 15 KG necessary to justify an offense level of 32. To move Tyrone into the next offense level (between 15 and 50 kilograms), Probation relies on a Government proffer that "Williams testified that they had successfully moved 5 kilograms of cocaine in 2013." PSR at 22. Probation then concludes—with no elaboration—that the total amount attributable to Tyrone should be 20 kilograms of cocaine. PSR ¶ 23.

Putting aside that these figures do not add up (5+5+5 = 15), they all suffer from the same infirmity—Xavier Williams. The relevant testimony on this 2013 purported transaction was absurd and should be given no weight whatsoever. Mr. Williams claimed to have assisted Tyrone with a narcotics transaction in 2013, but had no firsthand knowledge about whether it even took place. Tr. at 660 (stating that his knowledge was based just on "what he [Tyrone] told me."). In fact, Mr. Williams testified that he played no role in the actual transaction and that he was paid $5,000 for "doing nothing" and out of the "goodness of [Tyrone's] heart" (Tr. at 660):

> Mr. LaVigne: So my client paid you $5,000 out of the goodness of his heart?
>
> Mr. Williams: Yeah.
>
> Mr. LaVigne: To do nothing?
>
> Mr. Williams: Yeah.
>
> Mr. LaVigne: You got $5,000 for doing nothing?
>
> Mr. Williams: Yeah.

Tr. at 660. Agent Kaley, the lead HSI investigator assigned to the case, confirmed that none of Mr. Williams's statements pertaining to this transaction had ever been corroborated. Tr. at 1110 ("Q: Have you been able to corroborate the statements about the first transaction he did with Mr. Woolaston? A: No.").

Equally troubling is that Williams was all over the map on this transaction. *Compare* Tr. at 1092-93 (HSI Agent testifying that Mr. Williams initially proffered that this transaction involved 10 KG), *with* Tr. at 655-56 (Mr. Williams testifying that the same transaction involved 5 KG of cocaine and denying that he ever told prosecutors it involved ten kilograms). At trial, Mr. Williams claimed that he and Tyrone made a profit of $45,000 from the alleged 2013 transaction, even though he repeatedly told the Government that he made a profit of $90,000 from the alleged 2013 transaction. *Compare* Tr. at 656-657 (Williams testimony) *with* Tr. at 1092-93 (HSI Agent testimony). This is not something that can be overlooked or attributed to forgetfulness. Mr. Williams doubled down on these assertions at multiple proffer sessions. *See, e.g.,* Tr. at 1064-67 (proffering in February 2018 that the May 2013 transaction involved 10 kilograms); Tr. at 1070-71 (proffering the same in April 2018); Tr. at 1092-93 (proffering in May 2018 that the May 2013 transaction was 10 kilograms and generated $90,000).

The Government recognized the weakness of Mr. Williams's testimony during its summation when it stated that "[e]ven if Xavier Williams had never taken the witness stand, you have overwhelming evidence of the defendant's guilt, and you can convict the defendant based on that evidence alone." Tr. 1211. The Government cannot now sustain its burden to pile on drug weight by propping up Mr. Williams's incredible testimony, which it walked away from at trial.[3]

### 3. A Downward Departure is Appropriate for Imperfect Entrapment

Tyrone's entrapment defense caused Judge Sweet to remark at the close of the evidence "I'm glad I'm not on the jury." Tr. at 1296. While the jury rejected Tyrone's entrapment defense, "imperfect entrapment" is a recognized downward departure in the Second Circuit and is certainly relevant in considering the "nature of the offense" in the context of the Section 3553(a) factors (discussed below). Whether considered a departure or a variance, HSI's conduct in this reverse Sting investigation further warrants a below Guidelines sentence if Probation's calculations are used. *See, e.g.*, *United States v. Amor*, 24 F.3d 432, 438 (2d Cir. 1994); *Garza-Juarez*, 992 F.2d at 911 (citing cases).

In *United States v. Bala,* 236 F.3d 87 (2d Cir. 2000), the court stated, "we can find nothing in the guidelines to prohibit a district court from considering conduct by the government that does not give rise to an entrapment defense but that is nonetheless '*aggressive encouragement of wrongdoing.*'" *Id.* at 92 (emphasis added) (citation omitted). Specifically, the court held that Section 5K2.12 of the Guidelines "can reasonably be read to authorize such a departure in appropriate cases." *Id.* Courts have applied some formulation of this doctrine at sentencing. *See, e.g., United States v. Giles,* 768 F. Supp. 101, 103-04 (S.D.N.Y. 1991) (granting a downward departure based on "the manner in which Giles was set up for this crime by the Government's agent"); *Dones v. United States,* No. 08 CIV. 926 (RJH), 2010 WL 184451, at *5 (S.D.N.Y. Jan. 19, 2010) (granting downward departure in a Government sting investigation because while "Defendant was indeed a willing participant, [] the numbers tend to overstate defendant's criminality and his danger to the community"); *United States v. Garza-*

---

[3] Even if the additional five kilograms is added, Tyrone is at the absolute bottom of the range for Section 2D1.1(c)(4) since the aggregate amount would be 15 kilograms, and the enhancement is triggered only if the amount was between 15 and 50 kilograms. This further countenances in favor of lenity in imposing sentence.

*Juarez*, 992 F.2d 896, 912 (9th Cir. 1993) (granting downward departure based on "aggressive encouragement of wrongdoing," where Government agent "did not threaten the defendants, but it was he who initially proposed the illegal activity and persistently contacted [one of the defendants] by telephone and in person over several months until the scheme was completed").

Beyond Judge Sweet's finding of inducement, there is ample evidence that Tyrone's conduct was the product of "aggressive encouragement of wrongdoing," *Bala,* 236 F.3d at 92.

### HSI's Repeated Outreach to Williams And Tyrone

The Government first tasked two informants, CS-1 and CS-2, with contacting Mr. Williams from at least June through August 2015, which did not result in any arrests. The investigation remained dormant until about March 2017, when Special Agent Michael Calamia took over all investigations at the Airport and instructed the case agent to kickstart the investigation into Mr. Williams. Tr. 236-38. The case agents then directed CS-2 to get in touch with Mr. Williams (and later Tyrone) to ensure that they could develop a successful sting operation involving more than five kilograms of cocaine. The ensuing conduct was the epitome of "aggressive[ness]" as the evidence at trial showed.[4]

At the case agents' direction, CS-2 placed countless calls to Mr. Williams, including over 60 phone calls from September 2017 through February 2018 alone. (DX 3004.)[5] Mr. Williams described CS-2's constant phone calls to him as "pestering" and "bothering him" to the point where Mr. Williams did not even call CS-2 back. Tr. at 702-03.[6] During this time-frame (2015 to late 2017), Mr. Williams and Tyrone were *not* engaged in narcotics trafficking, (Tr. at 700-01), and Mr. Williams agreed to engage in this transaction only at a time when he was short of money, Tr. at 704-06. CS-2 always directed Mr. Williams to contact and relay information about his proposals to Tyrone, which Mr. Williams routinely did. *See, e.g.*, Tr. at 714-15 (Mr. Williams testifying that CS-2 directed Mr. Williams to pass on details of the transaction to Tyrone); *id.* at 715 (Mr. Williams explaining that CS-2 "wanted Tyrone actually to see the money").

---

[4] *See, e.g.*, Tr. at 1089-90 (HSI agent testifying that from March 2017 until October 2017, Mr. Williams "was not responding," "was avoiding," and was "stand-offish" to CS-2's attempts to get him to do a drug deal); DX 2069 (Mar. 2017 text exchange, where HSI agent writes to CS-2: "can you reach out to the airport guy? We might have something. Do you think he could work?"); DX 2072 (May 2017 text exchange where HSI Agent writes to CS-2 about Williams: "you don't think he's stopped right?" CS-2 responds "No, he's still working," to which HSI Agent writes "OK, good."); DX 2077 (Jan. 2018 text exchange where HSI Agent writes to CS-2: "come on . . . *sell it to these guys*."); DX 2078 (Jan. 2018 text exchange where HSI Agent writes to CS-2: "I just don't see why they don't want the money"); DX 2084 (Sept. 2017 text exchange where HSI agent expresses concerns to CS-2 about Mr. Williams being "scare[d]" off by CS-2 and not being "serious" about the drug deal).

[5] The full extent of this outreach is unknown since CS-2 often placed unrecorded and unmonitored calls to Williams. Tr. at 957-59, 1091.

[6] *See also* Tr. at 915 (CS-2 testifying that he needed to "gain back trust" with Mr. Williams in March 2017); DX 2072 (April 2017 text exchange where CS-2 tells HSI agent that Mr. Williams is "avoiding" him and will "have to take it slow"); Tr. at 973 (CS-2 testifying that in June 2017, Mr. Williams was still not interested in discussing a drug deal).

### *Provision of Money Upfront*

A critical component of this reverse Sting operation was HSI agents directing CS-2 to provide $4,000 cash upfront to Mr. Williams and Tyrone. In the blunt words of SA Calamia (the supervising agent), this tactic was to "**lock in a conspiracy**." Tr. at 258 (SA Calamia further testifying that "the purpose of that meeting was to have a transfer of money so that they could be – so that they were – that it was the overt act needed for them to be involved in that conspiracy.")

On January 6, 2018, CS-2 insisted that Mr. Williams contact Tyrone to show him $10,000 cash to induce them to proceed. Tr. at 715; *id.* at 964 (CS-2 explaining that "[t]he goal was to make sure they got the money"). Mr. Williams further testified that the promise of upfront money was "critical" to move the transaction. Tr. at 799; only after CS-2 provided the cash did the transaction move forward. Tr. at 807 (Mr. Williams agreeing that the money was what "kick-started this whole operation").

### *Hesitation*

Tyrone repeatedly expressed hesitation about assisting Mr. Williams and CS-2. This is shown by the time it took for the Sting to unfold. Neither Mr. Williams nor Tyrone agreed to engage with CS-2 until late 2017 (when Mr. Williams ran into money issues); even then, the operation stalled for approximately five months (from October 2017 to February 2018). Tyrone repeatedly expressed ambivalence to Mr. Williams about proceeding, including up and until the day of the controlled delivery. *See, e.g.,* Tr. at 1233-34 (summarizing text communications from Tyrone to Mr. Williams about the transaction, including "IDK [I don't know]" (on December 6), and "[t]oo much headache on me. Best case I running one and leaving them alone" (on January 7)).

In fact, in multiple recordings, Mr. Williams explained to CS-2 that he needed money to convince Tyrone to participate in the conspiracy. *See, e.g.,* DX 1007.1 (Dec. 6, 2017 call where Mr. Williams tells CS-2, "the only way I can convince [Tyrone to do the deal] is through finances").) Even after providing the upfront money, the lead case agent still had to implore the CS-2 to "sell" the plan to Tyrone, who appeared not to "want the money." DX 2077 (Jan. 2018 text where HSI agent tells CS-2 "come on . . . sell it to these guys"); DX 2078 (Jan. 2018 text where HSI agent says to CS-2, "I just don't see why they don't want the money"); *see also* Tr. at 975-77; *id*. at 964.

### *CS-2's Veiled Threats*

Such measures were not limited to phone calls and money. CS-2 also presented himself as a well-connected drug dealer with connections to Venezuela and Colombia, which was intended to instill fear in Mr. Williams and Tyrone so that they would not back out. Tr. at 716, 927-28, 986-87; DX 1015.5 (CS-2 explaining that he works with Colombians and "[t]hey're killing right away now."); Tr. at 716 (Mr. Williams testifying that he understood CS-2 to be a dangerous man whose wife's head was chopped off by Colombian drug dealers.)

Recordings further reflect that both Williams and Tyrone were frightened. On the very day of the transaction, Mr. Williams explained to Tyrone "my life is still in it. . . . my life is still in jeopardy, you know," DX 1017.1-T at 7, and Tyrone repeatedly counseled Mr. Williams not to

meet with CS-2 to deliver the drugs, explaining that he was "not risking [Mr. Williams'] life on that," *id*. at 4, and "not putting your life in that," *id.* at 7.

Collectively, the HSI case agents and CS-2's conduct in this investigation was an "aggressive encouragement of wrongdoing," *Bala*, 236 F.3d at 92 and contributed to why we are here. Whether through a departure or variance, the background to this offense and HSI conduct further countenances in favor of the minimum possible sentence.[7]

## C. Section 3553(a) Factors

No matter what Guidelines calculations are used, the Section 3553(a) factors compel the 15 year mandatory minimum sentence. This is the lone sentence that would be "sufficient, but not greater than necessary to fulfill the purpose of sentencing." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (internal quotation marks omitted) (*en banc*) (quoting 18 U.S.C. § 3553(a)).[8]

A key reason for this is Tyrone's unique "history and characteristics," which is a critical component of the Section 3553(a) analysis. As Judge Rakoff declared:

> [I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what

---

[7] In the alternative, the Defense submits that downward departures for sentencing manipulation or sentencing entrapment are warranted based on the above course of conduct. *See United States v. Caban*, 173 F.3d 89, 93 n1. (2d Cir. 1999) ("Sentencing manipulation has been described as occurring when the Government engages in improper conduct that has the effect of increasing the defendant's sentence."); *Id.* at 93 n.1 (internal quotation marks omitted) (stating that sentencing entrapment normally requires that "a defendant convince the fact- finder that government agents induced her to commit an offense that she was not otherwise predisposed to commit.").

[8] Specifically, the Court is required to consider the following factors under Title 18, United States Code, Section 3553(a):

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant:
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for –
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .;
> (5) any pertinent policy statement . . . [issued by the Sentencing Commission];
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (internal quotation marks omitted). Probation relied on Tyrone's unique characteristics in recommending a 15-year sentence, which is well below the Guidelines range it computed. PSR at 28. Probation cited to Tyrone's lack of criminal history, strong ties to his family and community, and stable employment history. PSR at 27-28.

Probation reached the correct conclusion, but the two-page summary does not capture the essence of Tyrone's character. The below make clear that a sentence above the mandatory minimum will not be "just punishment," that there is no need for further specific deterrence, and that Tyrone poses no risk of recidivism.

### 1. History and Characteristics of Tyrone

We have enclosed 25 letters of support on Tyrone's behalf (Exs. A-Y). The letters are remarkable, and are from people who crossed paths with Tyrone throughout different phases of his life. These include letters from: (1) Tyrone's long-time girlfriend Nicole Thompson, who speaks about Tyrone's role in her and her daughter's lives (Ex. A); (2) Tyrone's father, sister, and aunt (Ex. D, G, V); (3) Tyrone's friends from when he was a younger man and student (Exs. E, F, N, O, U, W, Y); (4) fellow firefighters (Exs. B, C, H-J, L, M); (5) a fellow United Airlines co-worker (Ex. K); (6) a fellow inmate (Ex. Q); (7) letters from three Metropolitan Correctional Center ("MCC") officials (Exs. R, S, and X), including from a Lieutenant who writes about how Tyrone helped him put out a fire at the MCC and "want[s] him to be recognized for his efforts," Ex. S; and (8) a letter from Tyrone's childhood pastor (Ex. P).

While the writers each know Tyrone in different capacities, the letters all share a common thread— that Tyrone is devoted to his five-year old daughter, is dependable and trustworthy, and is humble and kind. These words percolate through the letters, but it is the raw, personal anecdotes that stick out. These include comments from fellow firefighters about Tyrone performing CPR on a victim for 45 minutes to save his life (Ex. B), or running into burning buildings without hesitation" (Ex. B). There is a story from a friend about Tyrone saving his cousin who was suffering from epilepsy (Ex. O); from an inmate who credits Tyrone with helping him turn his life around (Ex. Q); from an MCC Lieutenant who recalls Tyrone volunteering to help him put out a fire on Tier 9 when the MCC was being evacuated (Ex. S); from Nicole about the little things Tyrone does for her—like getting up early to shovel off snow from the driveway (Ex. A); and from his childhood pastor who still calls Tyrone "my son" (Ex. P). *See also* PSR ¶ 53 (noting that "a common theme in each letter was that Woolaston was described as an honest, hardworking, and loyal individual") (internal quotation marks omitted).

And the letters are corroborated by Tyrone's verified history—working two full-time jobs; no criminal history; college education; and continuing to self-improve and help others during his incarceration. As Tyrone stands before the Court, his history and characteristics compel the minimum sentence.

### Childhood

Tyrone's success and work ethic are impressive given challenges he faced in his childhood. Tyrone and his sister were raised by their mother, Gladys, in South Florida after moving from New Jersey following their parents' separation. PSR ¶ 49. Tyrone was extremely close with his single mother. When Tyrone was just 15, Tyrone's mother left for work one day and never came back due to her sudden death. *Id*. This had a significant impact on Tyrone. Exs. E, G, P (Tyrone's pastor recalling his "confusion and deep sorrow"). Tyrone was uprooted from South Florida and moved to New Jersey to live with his father. PSR ¶ 50. Tyrone stayed positive, made new friends, and (even today) was universally described as respectful, loyal, and sweet by those who knew him from high school. *See, e.g.*, Ex. E (describing Tyrone as a "sweet and respectful boy"); Ex. N (stating that as a young man Tyrone was "willing to serve anyone in need")).

### Education and Early Employment

Tyrone graduated from the Chad Science Academy in Newark, NJ. PSR ¶ 62. Tyrone was a good student and was popular and well liked. Exs. E, F, N, P. Classmates described Tyrone as someone that "everyone liked" and that he would walk "through the hallways with a bible in his hand…because he remembered how much his mom loved God." Ex. E. One former classmate (who described herself as "the quiet and geeky girl in the honors class") recalls that, Tyrone "protected he [sic], carried my bags, and even scolded me if he did not approve of something." *Id*. Tyrone's pastor remembers Tyrone as polite, always "address[ing] the adults in our group as either yes sir, no sir, yes ma'am, no ma'am." Ex. P.

Following graduation, Tyrone attended Keane University in Union, NJ. PSR ¶ 63. Tyrone completed approximately 50 credits before he was unable to continue due to "financial constraints." *Id*. In 2004, Tyrone began working full time for Able Medical Transportation. PSR ¶ 68. Shortly thereafter, in approximately 2005, Tyrone took a full-time job with United Airlines at Newark Liberty International Airport. *Id*. ¶ 65. At both Able Medical Transportation and United Airline, Tyrone was considered to be an excellent employee with a strong work ethic. Ex. K (United Airlines employee writing that Tyrone worked "extremely hard").

### Devoted Father

In 2015, Tyrone welcomed the birth of his daughter. (PSR ¶ 54). This was a life-changing event. Virtually every letter from those that knew Tyrone before his incarceration refers to him as a doting father. *See, e.g.*, Exs. A, B, C, E, G H, I, J, K, L, M, O, P, and U.

When Tyrone became concerned about his daughter's living conditions, he fought for and won sole custody of her. PSR ¶ 54. This was inspiring to many, but consistent with the character Tyrone has demonstrated throughout his life. Ex. J ("[Tyrone] inspired me as a father. When he didn't not [sic] agree with the living conditions for his daughter Tyrone made it his business to not only get custody of her but full custody."); Ex. M ("Tyrone fought very hard to win custody over [his daughter], and in a world with so many absentee fathers I thought it was beautiful to see a man fight for what his [sic] best for [his] child.")

As Nicole explained, Tyrone's "greatest joy" was becoming a father. Ex. A. Tyrone worked two full-time jobs just to provide her a better life. *Id.* Everyone attests to the love and devotion Tyrone has for his daughter. Long-time friends observed it. *See* Ex. E ("his [Tyrone's] dedication to his daughter's upbringing was exceptional and admirable. I cannot put into words how much Tyrone loves his daughter. I can only imagine what he is going through being away from her."). So too did his fellow firefighters. Ex. B (referring to Tyrone's daughter as "[a] beautiful angel of a little girl always happy to see her daddy"); Ex. C ("[Tyrone] adores his baby girl…I can recall him carrying the baby carrier into the firehouse and holding her in his arms…"); Ex. B ("[t]hey were inseparable every where [sic] he went she went [sic] A total daddy's girl."); Ex. M ("Tyrone's daughter…was his entire world."); Ex. I ("[Tyrone's] daughter loves her dad unconditionally and you can tell by the way she lights up when she sees her dad.")

Tyrone also serves as a father figure to Nicole's daughters from a previous relationship. Ex. A. ("He [Tyrone] would help in many ways like transporting my daughter to school when I had to work and assisting in any way he can."). The children of Tyrone's coworkers at the Orange Fire Department also looked to him as a father figure. As one firefighter explained, "I have four children, every time they come to visit the fire house every single of them ask [sic] "where's Tyrone?" Ex. B.

Tyrone also took care of less fortunate children in his community. Exs. B, M. During the Christmas season, Tyrone "decided to use his own money and go out and buy kids he didn't know a large amount of random toys…he did [this] every Christmas without hesitation every year." Ex. B; *see also* Ex. M ("Tyrone used to out of his own pocket purchase, wrap, and deliver gifts for kids who would have nothing under the tree on Christmas morning."). Tyrone did not do this for any recognition or accolades; he did it because he thought it was the right thing to do. Ex. M ("He would do so in a nonchalant manor, not to earn glory or praise. He just did it because he thought it was right.").

### *Public Service – Orange Fire Department*

Tyrone loves his community of Orange, NJ. It was his goal to serve as a fireman and he did so with honor and distinction starting in 2013. PSR ¶ 67 (noting Tyrone's "exemplary career with the City of Orange Fire Department"). Seven different firemen submitted letters of support for Tyrone. *See, e.g.*, Exs. B, C, H-J, L, M. These include three fire captains, including the Deputy Chief of the Orange Fire Department, Terrence Cobbertt. Exs. I, H, L.

The key traits of a fireman are selflessness and dependability. The job mandates that a person put the public before self; running *into* harm's way, when others are running *from* harm's way. Each letter describes in detail, with personal anecdotes, Tyrone's character for selflessness, leadership, reliability, and loyalty. *See, e.g.*, Ex. C ("[Tyrone] embodied the term 'public servant'."); Ex. M ("Tyrone didn't only value his blood family, but his firehouse family and the citizens of Orange were very important to him.").

Tyrone began his career as a firefighter at the Essex County Police and Fire Training Academy. Ex. C. Even at this early stage, Tyrone distinguished himself from his peers. A fellow firefighter described one instance where Tyrone "refused to leave his fellow firefighter behind as they performed their daily physical training run in academy." *Id.* He succinctly

described why Tyrone did this: "It's heart. It's love. It's loyalty. It is a basic human decency that isn't so easy to identify in the average person." *Id.*

The City of Orange firefighters all presented Tyrone as someone who would never hesitate to help others in harm's way:

- Ex. B ("Never did I worry that he [Tyrone] didn't have my back in a fire where a split second can cost you his life and my own.");

- Ex. C ("Tyrone Woolaston is a man who is willing to give his life for a complete stranger so that they may live. We ran into burning buildings together and he did so without hesitation; to preserve life and property while risking his own. His bravery and resilient nature made him an excellent firefighter and a great human being.");

- Ex. I ("I've seen how he takes to the citizens with sympathy and I see how the citizens appreciate his presence."); and

- Ex. J ("I have put my life in [Tyrone's] hands a couple of times and never once questioned his judgment.").

One example in particular stands out. On one firefighter's "very first calls," he and Tyrone responded to a medical emergency. Ex. B. Tyrone and the other firefighter arrived on the scene to find an unresponsive man clinging to life. Despite the sweltering heat, Tyrone and the firefighter performed CPR on the patient for "over 45 minutes." As the firefighter noted, never once did Tyrone complain because in that moment "it wasn't about us it was about that patient." *Id.*

Tyrone also took it upon himself to serve as a mentor to the junior firefighters in the department. *See* Ex. B (describing Tyrone as a person who would "seek me out to help me train on our own."); Ex. M ("he was someone I looked up to as a junior firefighter."). The leadership of the fire department consistently described Tyrone as a dedicated professional. *See, e.g.*, Ex. L (Terrence Cobbertt, Deputy Chief of Orange Fire Department, wrote that "he [Tyrone] excelled at his craft…he is a very humble person with an excellent work ethic."). Tyrone's desire to serve his community did not go unnoticed even by the most senior of employees at the fire department. As Captain Monique Allwood wrote, "Tyrone will give the shirt off his back to anyone with no thought of *(sic)* hesitation…I've seen how he takes to the citizens with sympathy and I see how the citizens appreciate his presence." Ex. I.

### *Dedication to Others*

The above traits are not limited to Tyrone's official capacity. Numerous letters contain personal anecdotes of family and friends, reflecting Tyrone's dependability and acts of kindness. They show that Tyrone was the first person called if any of his friends or family found themselves in need of assistance. *See, e.g.*, Exs. A, B, E, N. One acquaintance explained that Tyrone was "the type of friend/brother that if you're in a bind he's there to assist in a heartbeat no questions asked." Ex. B. These acts started at a young age. A high-school friend of Tyrone's recounted how Tyrone assisted her special needs brothers and sisters throughout high school.

Ex. E. Another recalled how Tyrone took immediate action when his epileptic cousin started having a seizure, ensuring that she got to the hospital on time. Ex. O.

This continued throughout adulthood. Whether it was assisting an elderly relative with her day to day life, Ex. A, or adopting a special needs dog from a shelter because Tyrone "believed in second chances," Ex. J, Tyrone always put the needs of others before his own. An Arson Investigator with the Orange Fire Department described the "significant amount of support" Tyrone showed after the passing of his mom in 2014 from cancer. And the authors of the letters uniformly write that Tyrone always did selfless things like this without any expectation of receiving recognition. Ex. A (describing an instance where Tyrone cleared Nicole's entire driveway in a snowstorm without telling her); Ex. M ("He would do so in a nonchalant manor, not to earn glory or praise. He just did it because he thought it was right."). Nicole, perhaps the person who knows Tyrone best, summarized the general sentiment of Tyrone's friends and family, "without a doubt, I can truly say he has been a great joy and asset to my life, to his family, friends and the community." Ex. A.

### *No Criminal Record*

Tyrone has no criminal record. PSR ¶¶ 40-41.

### *Incarceration – A Model Inmate*

Tyrone has shown these same characteristics of honor, selflessness, and dedication ever since he has been incarcerated in connection with this offense. Tyrone received three letters of support from MCC officials, which is highly unusual in counsel's experience. *See* Exs. R, S, X,

One letter in particular stands out. Lieutenant West, a corrections officer at the MCC, wrote about a fire that broke out at the MCC and "quickly overtook the entire unit." Ex. S. He noted that "[a]s the inmates were being evacuated inmate Woolaston came to me and told me where the flames were coming from. As I grabbed the fire extinguisher he asked if he can help. I replied yes and he then grabbed another fire extinguisher and proceeded to help extinguish the flames." *Id.* Lieutenant West added that "I did appreciate his willingness to help me extinguish that fire and want him to be recognized for his efforts." *Id.*

Two others tout Tyrone's work performance with the food service departments at the MCC. *See* Ex. R (noting that he is "professional at work, an extremely hard worker, and he puts all his efforts to get the job done in the given time") and Ex. X (same). Tyrone's MCC work evaluation is also attached hereto (Ex. T) and reflects "outstanding" scores in every category.

In addition to working, Tyrone continues to devote himself to self-improvement while incarcerated. He has completed several education courses, including: Child Support Seminar, Focus Forward, Commercial Driving License Preparation, Music Appreciation, and Tutor Training. PSR ¶ 65. He has also served as a student instructor for Leadership and Influence," "Business Ethics," "Marketing Basics," "Sales Fundamentals," "Time Management," "Investments, Tutor Training," "Customer Service," "Developing Creativity," "Conflict Resolution," "Stress Management," "Servesafe Food Handling Program," "Basic Bookkeeping," "Music Appreciation," and "Resume Writing." *Id.*

Tyrone is also assisting fellow inmates on their paths of self-improvement.  He is a student instructor for the following classes:  Leadership and Influence," "Business Ethics," "Marketing Basics," "Sales Fundamentals," "Time Management," "Investments, Tutor Training," "Customer Service," "Developing Creativity," "Conflict Resolution," "Stress Management," "Servesafe Food Handling Program," "Basic Bookkeeping," "Music Appreciation," and "Resume Writing."  PSR ¶ 65.  In addition to this lengthy list, Tyrone is a GED tutor assisting other inmates to obtain their GEDs.  PSR ¶ 68.  A fellow inmate submitted a letter on Tyrone's behalf, explaining that he was depressed and had lost hope.  Ex. Q.  Tyrone helped inspire the inmate through his work as a GED tutor and was an "exceptional bonus."  *Id.*  The inmate also recalled Tyrone's heroic efforts when the fire broke out at the MCC.  *Id.*

### *Continued Support of Family*

Tyrone continues to rely on the bedrock of his family for support.  Nicole writes that "[Tyrone] has truly love[d] and respected me as a woman and parent and I can only be thankful."  *Id.*  Tyrone's aunt (whom he also cared for) wrote that Tyrone is a "person of good moral character, who comes from a strong family.  He knows what it means to do an honest day's work and the value that comes from his labour [sic]."  Ex. G.  Tyrone's father and sister likewise expressed their support.  Exs. D, V.

Tyrone's family expressed shock at this offense.  Exs. A, D, G.  Tyrone's father explained it perfectly: "I have no one in my family ever go to prison.  But my son make a mistake and he will be a better person I know he never [has] never been in trouble with the law before."  Ex. D.  The family also expressed hope.  Tyrone's aunt explained that she "and other family are willing to give Tyrone the support that will be needed to re-establish him back into the community in a positive way."  Ex. G.  Nicole "strongly believe once given the opportunity, he will prove to you and this court the upstanding Godfearing man I know him to be."  Ex. A.  And his childhood pastor notes that he may not be alive in 15 years, but wants to let Tyrone "know how proud I am of who he is and how much I still LOVE him."  Ex. P.

### 2.  The Nature and Circumstances of the Offense

The offenses for which Tyrone has been convicted are serious.  But 15 years is more than a sufficient penalty, especially considering the nature and circumstances of this particular Sting offense, which we summarized above.  The Government and PSR make much of the firearm that law enforcement officers claimed to have recovered from Tyrone.  But this testimony should also be put into context with the fear that CS-2 instilled in Xavier Williams and Tyrone through veiled threats, and which both Mr. Williams and Tyrone expressed on the day of the controlled delivery during wire-tapped calls.  *See* pages 11-12, *supra.*  Even Mr. Williams conceded that guns were not part of this so-called conspiracy and that Tyrone was not a "gun guy."  Tr. at 812-13.

### 3.  The Objectives of Sentencing

Moreover, a sentence of 15 years of imprisonment is more than sufficient to achieve the additional aims of Section 3553(a), including the need to reflect the seriousness of the offense, to

promote respect for the law and provide just punishment, to provide adequate deterrence, and to protect the public from further crimes by the defendant.

*First,* regarding just punishment, 15 years is an eternity for Tyrone. It will prevent him from raising his daughter during her formative years. Tyrone fought to get sole custody of her, was by any objective account a doting father, and has now lost what was most important to him. It also will keep him from Nicole, who has supported him throughout this nightmare, and deprive him of his dream of working as a fireman. In short, the mandatory minimum will take away from Tyrone the most important things in his life for 15 years. An extra *five years* under the broadest interpretation of the Guidelines is Kafkaesque.

*Second,* there is no risk of recidivism. Tyrone has no prior criminal history. In 15 years, Tyrone will be 52 years old. The Sentencing Commission found that offenders who are 51 or older at the time of release have a lower recidivism rate than any other age bracket, other than those released when they are younger than 21. United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comparative Overview,* at 23 (Mar. 2016), available here. Additionally, in FY 2019, 89.4% of drug trafficking offenders were under the age of 50. This further confirms the low likelihood of recidivism. United States Sentencing Commission, *2019 Annual Report and Sourcebook of Federal Sentencing Statistics* at 6, available here.

*Third,* the goals of general deterrence are satisfied with a 15 year sentence. It is a severe sentence under any guidepost and a higher number will have no bearing on further deterring the public from engaging in such conduct,

*Fourth,* the recommendation of 15 years' imprisonment is consistent with a Guidelines calculation that excludes the 924(c) mandatory minimum. If Tyrone were never charged with Count 2, then he would be assessed a two-level gun enhancement to the offense level for Count 1. *See* U.S.S.G. § 2D1.1(b)(1). This would yield an offense level of 36 (under Probation's current Guidelines formulations). The corresponding Guidelines range for that offense would be 188-235 months, which is in line with the 180 months recommended by Probation. The bottom of that range is approximately equal to the mandatory minimum sentence that Tyrone faces and is more than sufficient to achieve the purposes of sentencing.

Tyrone chose to exercise his Sixth Amendment constitutional right to trial and raise the defense of entrapment, which included facing two serious charges that carried high mandatory minimum sentences. Adding an additional five years to this sentence—for a man who worked two jobs (including as a firefighter), has no criminal history, and previously complied with all pretrial restrictions—is a draconian result and is driven in large part by Tyrone's decision to exercise his constitutional entitlement to proceed to trial. *United States v. Goodwin*, 457 U.S. 368, 372 (1982) ("[W]hile an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right"); *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional'") (citation omitted); *United States v. Hutchings*, 757 F.2d 11, 14 (2d Cir. 1985) ("The augmentation of sentence based on a defendant's decision

to stand on [his] right to put the Government to its proof rather than plead guilty is clearly improper") (citation and internal quotation marks omitted).

*Fifth,* highly dubious Guidelines enhancements are what is driving a potential sentence above the mandatory minimum. This is precisely why the Second Circuit has held that the Guidelines are *not* presumptively reasonable.

### 4. The Avoidance of Unwarranted Sentencing Disparities

A sentence of 180 months is also consistent with "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Tyrone's codefendant, Xavier Williams, received a sentence of 36 months' imprisonment purely because of his cooperation, which appears to have been solely against Tyrone in a case where the Government already had wiretapped calls, consensually recorded calls, and law enforcement witness testimony regarding the controlled delivery. Tyrone's sentence will be five times longer (or 12 years) than Mr. Williams. Piling onto this amount achieves no objectives of sentencing.

### 5. Effect of COVID-19

Leniency is further warranted given the realities of COVID-19. It has long been true that individuals who are incarcerated are at greater risk for the spread of infectious disease, and this is equally true (if not more so) for COVID-19. *Federal Prisoners and COVID-19: Background and Authorities to Grant Release*, CONGRESSIONAL RESEARCH SERVICE, at 3-4 (updated April 23, 2020; Joseph A. Bick, *Infection Control in Jails and Prisons*, CLINICAL INFECTIOUS DISEASES, Volume 45, Issue 8, at 1047-1055 (Oct. 15, 2007), https://academic.oup.com/cid/article/45/8/1047/344842. In fact, as of September 30, 2020, almost 15,000 federal inmates and approximately 1,800 Bureau of Prisons staff have been diagnosed with COVID-19 nationwide. *COVID-19 Cases*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/. Expanding beyond federal prisons, this number balloons to over 218,000 inmates and officers. *Covid in the U.S.: Latest Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last updated October 1, 2020).

Moreover, the danger of COVID-19 is exacerbated, and likely undercalculated, due to the deplorable conditions at the MCC. Tyrone lives in fear every day that he will contract COVID-19. Since COVID-19 began, the MCC has been on perpetual lockdown. However, testing in the MCC has been essentially non-existent, likely leading to an undercalculation of COVID-19 cases and an inability to properly isolate those who are infected. As a result of the lockdowns, there have been stretches of 30 days where the inmates, including Tyrone, are only allowed out of their cells for 30 minutes every two days to take care of their personal hygiene. Inmates have, at times, gone days without showers.[9]

---

[9] Further, because of the lockdowns at the MCC, there have been instances where there was no hot water in the building and no air conditioning. Calls and email privileges are essentially nonexistent, and Tyrone can go considerable time without speaking to anyone. Classes and individual study have also been cancelled since

As this Court has recognized, COVID-19 poses "an extraordinary and unprecedented threat to incarcerated individuals," like Tyrone. *United States v. Scparta*, No. 18-cr-578 (AJN), 2020 WL 1910481, at \*9 (S.D.N.Y. Apr. 20, 2020). As of now, there is absolutely no indication that COVID-19 will become less of a threat in the near future, and no guarantee that it will ever become less of a threat to incarcerated individuals. The longer Tyrone is incarcerated, the more likely he is to be infected with COVID-19. *See Geovani M.-O. v. Decker*, No. 20 Civ. 5053 (KM), 2020 WL 2511428, at \*1 (D.N.J. May 15, 2020) ("The stark reality is that avoiding exposure to COVID-19 is impossible for most detainees and inmates."). (citation and internal quotation marks omitted). Therefore, Tyrone's sentence should not be any longer than the mandatory minimum. *See United States v. Russo*, 454 F. Supp. 3d 270, 278 (S.D.N.Y. 2020) ("Survival, not rehabilitation, has become for now the paramount correctional objective.").

## III.    REMAINING OBJECTIONS TO THE PSR

On July 24, 2020, we submitted objections to Probation's initial PSR. On August 27, 2020, Probation issued its revised PSR, which incorporated some, but not all, of our initial objections. As such, we incorporate all prior objections that Probation rejected in its revised PSR, including the following in particular:

- Paragraph 15: We reiterate our request that the following sentence be added to this paragraph: "SIDA cards were issued to all 22,000 Airport employees, including all baggage handlers." Without these additional facts, this paragraph's reference to Mr. Woolaston having a SIDA card that "granted him access to locations within the airport that were limited to authorized personal, including the cargo and baggage area" is misleading. The Government did not dispute the accuracy of these additional facts, but objected to their inclusion merely because "the fact that many other airport employees are also issued a SIDA card is irrelevant." But as discussed in Section II.B.1, *supra*, the number of other airport employees who held SIDA cards bears directly on whether Mr. Woolaston was in a "position of trust" at the Airport. If the fact that Mr. Woolaston held a SIDA is relevant, then so is the fact that this card did not grant Mr. Woolaston any heightened level of security access within the Airport.

- Paragraph 16: We reiterate our objections to the characterization of statements attributed to Mr. Woolaston in this paragraph, and we object to Probation's revisions.

  - The revised paragraph states, "On January 6, 2018, WILLIAMS and CS-2 participated in a conversation via FaceTime to discuss smuggling the cocaine into the U.S. from either Antigua or the Dominican Republic." This is incorrect. Mr. Williams and CS-2 had this discussion in person. (Tr. at 545-56.) Then, Mr. Williams and CS-2 called Mr. Woolaston via

---

COVID-19 began. These inhumane conditions further underscore why, as described below, Tyrone's sentence should be no longer than is absolutely necessary.

FaceTime.  (*Id.*)  This is consistent with the Government's objections.  We request this paragraph be revised accordingly.

- o  We reiterate our objection to the statement that Mr. Woolaston "ensured WILLIAMS that he was prepared to remove the luggage containing the cocaine from the flight," as the contents of the body wire recording are largely inaudible and there is conflicting evidence as to what Mr. Woolaston said during the FaceTime call.  Even the Government agrees that Tyrone did not make these statements.  PSR at 20.

- Paragraph 21:  We reiterate our objection to characterizing the contents of the safe as belonging to Mr. Woolaston.  The safe was in Mr. Williams' house, custody, and control.  While Mr. Williams opined at trial that the safe was Mr. Woolaston's, he could not articulate why the safe was maintained in his home.  In addition, no forensic evidence (such as fingerprints or DNA) linked Mr. Woolaston to this safe. Tr. at 121-22.  And, Mr. Williams was clear in his testimony that guns were not part of the alleged narcotics conspiracy, including ones recovered from his house.  Tr. at 813 (Mr. Williams explaining that guns were not purchased or maintained in the house to further his narcotics trade).

- Paragraph 54:  We reiterate our objection that the name of Mr. Woolaston's daughter should be changed.

## IV.  CONCLUSION

For all of the foregoing reasons, we respectfully request that the Court sentence Tyrone to the mandatory minimum term of imprisonment of 180 months.

Respectfully submitted,

/s/ Christopher LaVigne

cc:  AUSA Alison Moe
     AUSA Nathan Rehn